## THE " GALATEA."

Where, in order to avoid a collision between two vessels propelled by steam, one going with and the other against the tide, it is conceded that one should stop, it is the duty of the vessel proceeding against the tide to do so, as her movements can be controlled with less difficulty than those of the other vessel.

APPEAL from the Circuit Court of the United States for the Southern District of New York.

*Mr. R. D. Benedict* for the appellants.

*Mr. William M. Evarts, contra.*

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Owners of ships appoint the master and employ the crew, and consequently are, as a general rule, held responsible for the conduct of both in the navigation of the vessel.

Exceptions exist to that rule in certain cases; as where the craft is one without sails or steam apparatus, or where the difficulties of the navigation make it necessary to employ a steam-tug, and to turn over the control and navigation of the ship to the master and crew of the latter vessel.

Steam-tugs are usually employed in such cases; but the owners of the ship or other craft do not necessarily, in that event, constitute the master and crew of the accessory motive power their agents in performing the service, as they neither appoint the master of the steam-tug or ship the crew, nor can they displace either the one or the other. *Sturgis* v. *Boyer*, 24 How. 122.

Beyond doubt, they are under obligations to employ a sea-worthy steam-tug, as the accessory motive-power to their own ship or craft; and they continue to be responsible for the negligence, omission of duty, or unskilfulness, of the master and crew of their own vessel.

Much discussion of those questions, however, is unnecessary, as it is not pretended, in the case before the court, that the barges in tow were guilty of negligence, or that any act or omission of duty by those in the immediate charge of their navigation contributed in any degree to the collision. Instead of that, it appears that the suit was promoted by the owners of

the steam-tug, the three barges, and the owners of the cargo of the two barges loaded with coal.

Two of the barges — to wit, the " Pottsville " and the " Reading " — belonged to the owners of the steam-tug; and it appears that they were all taken in tow by the steam-tug, to be transported from Jersey City to New Haven; and it also appears that the tow was arranged with the " Reading " on the starboard side of the steam-tug, and that the " Pottsville " was on the port side, the " Hoffman " being on the port side of the " Pottsville.". Arranged as described, they were lashed together in the usual way by what are called spring-lines, stern-lines, head-lines, and breast-lines; and the master testifies that the lines were all good, and that the fastenings were sufficient.

Nothing occurred during the voyage, material to the present investigation, until half-past five o'clock in the morning of the day of the collision, when the steam-tug with the three barges in tow was passing through Hell Gate, on her way to the place of her destination. Sufficient appears to show that the sky was clear, and that the full moon was shining brightly above the horizon, and that the propeller " Galatea " was on her regular return trip from Providence to New York. Both the propeller and the steam-tug were well manned and equipped, and the evidence shows that they both displayed proper signal-lights; nor is there any reason to doubt that each was seen by the other in season to have prevented a collision, notwithstanding the tide was half-flood, running at the rate of seven knots an hour.

Bound out as the steam-tug with her tow was, she was running with the tide; and the propeller, being bound to New York, was of course heading against the tide, and it appears that she was running at her usual speed of twelve knots an hour. Though running with the tide, the evidence shows that the steam-tug was making two knots an hour less speed than the propeller; and the libellants allege that the propeller saw the lights of the steam-tug when the latter was opposite Astoria, and while the propeller was on the east side of Ward's Island, and before she arrived at Negro Point; that the steam-tug, when the two vessels were in those positions, blew a long signal-whistle to signify that both vessels should put their helms to port, and that each should go to the port side of the other;

and they allege that the propeller gave one long signal-whistle in reply, by which those engaged in navigating the steam-tug understood that their signal had been heard and was assented to and approved by those in charge of the propeller.

Satisfactory evidence is exhibited that the signal given by the steam-tug was heard, and that the lights of the steam-tug were seasonably seen by the propeller; and it is equally certain that those in charge of the respective vessels understood that each should port their helm, and pass the other on the port side. Testimony was introduced by the libellants to show that the signal to go to the right was given and answered a second time; but the point is not material, as it is proved beyond all doubt that there was no misunderstanding as to the course which each vessel was expected to pursue. Enough appears also to warrant the conclusion, that those in charge of each vessel understood sufficiently the character of the other. They were then a mile apart; but it is not doubted that the libellants knew that the lights ahead were the signal-lights of a large steamer, and it is equally certain that the propeller knew that it was a steam-tug with a tow that was approaching from the opposite direction.

It appears that the "Galatea" was a propeller of fifteen hundred and sixty-six tons; that she was two hundred and forty-five feet long, and fifty-four feet in width over all. On the other hand, the steam-tug was seventy feet long and seventeen feet wide, with three barges in tow, varying in length from one hundred and ten feet to one hundred and fifteen feet; and it appears that each was about the same width as the steam-tug.

Explanations as to the manner in which the tow was arranged have already been given; to which it may be added, that the barges projected some twenty feet forward of the stem of the steam-tug, and about the same distance aft the stern of the tug by which they were propelled.

Prior to and at the time of the collision, the master and pilot of the steam-tug was in the pilot-house, at the wheel; and it is proved that she had one man forward on deck, outside of the pilot-house, and that the master of each of the three barges in tow was at the helm of his respective barge.

None of these matters are much controverted, and it is admitted that the collision occurred at the time alleged in the libel; but the parties differ very widely as to the place where the disaster took place. Differences more antagonistic and irreconcilable are seldom encountered, even in collision cases, than are exhibited in the present transcript, in respect to that question; but still the parties concur in some things, which will afford some aid in the solution of the matters of fact in controversy : as, for example, they both admit that the collision took place while the two vessels were passing through what is called " Hell Gate ; " that the steam-tug, with her tow, was on her way from Jersey City to New Haven, and that the propeller was making her return trip from Providence to New York; that it was a moonlight morning, and that the proper signal-lights of each vessel were seasonably seen by the other, showing conclusively that one or the other, or both, must have been in fault.

Neither party sets up inevitable accident; and they substantially concur that the question which was in fault must depend upon the answer to be given to the inquiry, whether the collision occurred on the north or the south side of the channel, defined by the witnesses, in that state of the navigation, as *the true tide ;* that the steam-tug was in fault if the collision occurred on the north side, and that the propeller was in fault if it occurred on the south side, as alleged by the libellants.

Service was made ; and the respondents appeared, and filed an answer. Proofs were taken on both sides ; and the District Court, after having heard the parties, entered a decretal order in favor of the libellants, and referred the cause to a master to estimate the damages. Both parties were heard before the master, and he made a report to the District Court. Exceptions were filed to his report by both parties; but the District Court overruled all the exceptions, and entered a final decree in favor of the libellants for the sum of $13,123.21, and the respondents appealed to the Circuit Court. Hearing was again had in the Circuit Court; and the Circuit Court reversed the decree of the District Court, and entered a decree dismissing the libel : whereupon the libellants appealed to this court.

Matters of fact only are in controversy between the parties;

and it must be admitted that some of the questions presented are involved in some obscurity and doubt. Most of the questions discussed are comparatively unimportant, except as they bear upon the principal issue of fact between the parties as to the place where the collision occurred, — whether it was on the north or south side of the true tide, or channel of navigation, in that state of the tide.

Tested by the pleadings or evidence, it is plain that each vessel was bound to go to the port side of the other; and that, if they had both obeyed that regulation, they would not have collided. Both substantially admit that proposition in their pleadings, proof of which is found both in the libel and in the answer.

Pot Rock is the place designated in the libel as the place where the collision occurred; and it is clear, that, if it occurred in that vicinity, the libellants were not in fault. They allege that the collision occurred while the steam-tug was heading east by south; and that the propeller, while the steam-tug, with her tow, was in the prosecution of her trip, ran into and came into collision with the three barges; that her cutwater struck the "Hoffman," and, passing through the barge, struck the bow of the "Pottsville" and cut her entirely off, and then came in contact with the port bow of the "Reading," forward of her midships; and it appears that the result was that the "Hoffman" and the "Pottsville" with her cargo of coal sank immediately; and that the "Reading," with her cargo, sank in about ten minutes, all in very deep water; and that the barges and the two cargoes of coal became a total loss.

Directly opposed to that are the averments of the answer, in which the respondents deny that the propeller ran into the barges, or either of them, and allege that the barges drifted down and upon the propeller, and that they struck against and upon their vessel when she was not moving forward or towards the barges, but that she had stopped, and was backing her engines, with a view to avoid the barges, after having perceived that they were drifting down the tide and were in danger of running against the propeller; and that the collision occurred, not at Pot Rock, as alleged by the libellants, but abreast of Negro Point, which is very near the northern shore.

These references to the pleadings are sufficient, without more, to exhibit the real issue between the parties, and to show the proper application of the several propositions of fact maintained on the one side and the other in the argument at the bar. Such of those propositions as appear to be material will be considered. They are as follows, first giving the views of the libellants, and then those advanced by the respondents:—

Throughout, the libellants maintain that the collision occurred on the south side of the true tide, close to Pot Rock, which is emphatically denied by the respondents; and they insist that it took place on the north side of the channel, close to the opposite shore. Attempt is made by the libellants to support the main theory of the libel by another proposition of fact; which is, that the steam-tug and the barges, when the signals were exchanged between the steam-tug and the propeller, ported their helms, and kept as close to the edge of the true tide on the starboard side as they conveniently could, without getting into the eddy, which is just south of the Pot Rock, and which, as they claim, might have sent the craft ashore if they had drifted into it.

Suppose the steam-tug with her tow did port: still it is insisted by the respondents that the whole craft crossed the channel nearly to Hog's Back on the chart, on the northern edge of the true tide, and continued on that course until the collision occurred. Of course the libellants deny that proposition; and they insist that the propeller came across the channel from the northern to the southern edge of the same, and there struck the tow in charge of the steam-tug.

Diametrically opposite views are entertained by the respondents, and they insist that the propeller came down against the tide in the middle of the channel; and their theory is, that the steam-tug floated across the tide from the northern side of the channel, and that the port barge struck the stem of the propeller, and that it was by those means that the barges in tow were injured and sunk, as alleged in the libel.

Improbable as that proposition is, it needs more support to give it credence than is found in the evidence; and the libellants contend that the propeller was running at her usual speed

of twelve miles an hour when she cut through the two barges on the port side of the steam-tug.

Support to that view is certainly exhibited in the testimony introduced by the libellants; and the extent of the injuries inflicted by the concussion adds very decided confirmation to the statement of the witnesses.

Conclusions of fact are all that can properly be expected in such a case, without any attempt to give the details of the evidence. All of the evidence has been examined; and the court, after having duly considered the arguments of counsel, is of the opinion that the steam-tug, with the barges in tow, was as far towards the southerly edge of the true tide as she could reasonably be required to go in passing through that dangerous and narrow channel of navigation. Usage gave her the right to go through at half-flood tide; and the evidence is convincing that her tow was not greater than she was accustomed to transport through that channel on such occasions, nor is the theory of the propeller sustained that the steam-tug was at any time on the northern side of the true tide subsequent to the exchange of signals between the two vessels.

Properly weighed, the evidence is satisfactory that the two vessels came to a distinct and clear understanding by those signals, that each should port their helms, and pass on the port side of the other; and the court here is of the opinion that the steam-tug took every necessary step to carry that understanding into effect, and that she was as near to Pot Rock as the character of the navigation would safely allow.

Ample width was left to the northward of the line of her course for the propeller to have passed in safety, if she had conformed to the arrangement properly to be inferred from the signals. Those in charge of the navigation of the propeller testify that she ported her helm as she came round Negro Point: and it may be that she did; but it is scarcely to be believed that the helm was put *hard a-port*, as the most rational mode of accounting for the collision is, that her bow was struck by the tide just as she came round that point, which gave her a more southern direction across the true tide than she otherwise would have pursued.

Judging from the whole evidence, the better opinion is, that,

if her helm had been put *hard a-port*, the collision might have been avoided, as in that event she would have gone pretty close to the northern edge of the true tide, instead of crossing the same in the direction of the place where the collision actually took place.

Beyond doubt, the navigation through that gate is quite dangerous; and yet the evidence tends pretty strongly to show that both vessels, if proper precautions had been used, might have passed each other in safety, and without danger of collision. Nor is it necessary to decide that question; for, if it be conceded that one or the other should have stopped, it is clear that it was the duty of the propeller to adopt that precaution, as she was proceeding against the tide, and could control her movements with much less difficulty than the steam-tug, as the latter was running with the tide.

Apart from this, the evidence shows that the usages of navigation authorized the steam-tug to proceed on her voyage in that state of the tide; and it is obvious that she could not stop, as she was going with the tide at the rate of ten miles an hour, with the aid of her engine. Without doubt, she might have stopped her engine; but it is very doubtful whether the stopping the engine at that moment would have had any tendency to prevent the collision, as it appears that the propeller struck the tow on the port side nearly at right angles.

Viewed in the light of the whole evidence, the court is clearly of the opinion that the propeller was wholly in fault, and that the collision was occasioned by the negligence, and want of due care, on the part of those in charge of her navigation.

Certain exceptions were taken in the District Court to the report of the master; but inasmuch as the respondents did not appeal, and the libellants have not pressed their objections, it is not deemed necessary to give the exceptions any consideration.

*Decree reversed, and the cause remanded with directions to affirm the decree of the District Court.*