THE SCOTS GREYS *v.* THE SANTIAGO DE CUBA.*

THE SANTIAGO DE CUBA *v.* THE SCOTS GREYS.

(*District Court, E. D. Pennsylvania.*   January 4, 1881.)

1. ADMIRALTY — COLLISION — MEETING OF VESSELS IN NARROW CHAN-
   NEL — DUTY ARISING FROM SPECIAL CIRCUMSTANCES. — Two steam-
   ships approached each other on the same side of a narrow, curving
   channel, across which a flood-tide was sweeping.  One was deeply
   laden, and coming with the tide; the other, light, and stemming the
   tide.  At the point where it seemed probable that they would meet
   they could not pass without danger.  *Held*, that it was the duty of the
   light vessel to have slowed down until the other had passed the
   dangerous point, and that not having done so she was responsible
   for the damages caused by a collision.

2. SAME — INAPPLICABILITY OF ORDINARY RULES OF NAVIGATION. — The
   ordinary rules of navigation applicable to places affording ample
   sea-room are not applicable under such circumstances as existed in
   this case.

In Admiralty.

These were a libel and cross-libel, filed, respectively, by the
steamships Scots Greys and Santiago de Cuba, to recover
damages for a collision between the two vessels in the Dela-
ware river.  The collision occurred at or near a buoy which
marks the eastern extremity of Horseshoe shoal.  This shoal
is a sandbar, somewhat resembling in shape a horseshoe,
with both heels on the western or Pennsylvania shore, and
the toe extending out into the river to within a short distance
of the eastern or New Jersey shore, the channel curving
around its eastern extremity.  The collision occurred about
noon, with a flood-tide and north-west wind.  The Scots Greys
was coming up the river, deeply laden, and the Santiago de
Cuba was going down light.  Both vessels were approach-
ing the Horseshoe buoy, the Scots Greys being the nearest to
it.  The Santiago de Cuba blew one whistle to indicate to the
Scots Greys her desire to pass to the westward, and ported
her helm.  This signal was not heard on, nor answered by,
the Scots Greys.  As the vessels continued to approach, the
Santiago de Cuba again blew one whistle, which was neither

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.
   v.5,no.4—24

heard nor answered, and continued to port her helm. The two vessels came in collision above the buoy, the Santiago de Cuba striking the Scots Greys on the starboard bow. On behalf of the Scots Greys it was contended that the Santiago de Cuba was passing down in the middle of the channel, and caused the collision by porting her helm and running into the Scots Greys after the latter vessel had rounded the buoy and straightened up on the western side of the channel. On behalf of the Santiago de Cuba it was contended that she was passing down on the western side of the channel, and that the collision was caused by the Scots Greys continuing to starboard her helm after rounding the buoy, instead of porting it in obedience to the signal from the Santiago de Cuba and pursuing the usual course up the channel, which it was claimed would have carried her to the eastward of the latter vessel.

*Curtis Tilton* and *Henry Flanders*, for the Scots Greys.

*John G. Johnson*, for the Santiago de Cuba.

BUTLER, D. J. There is an unusual amount of testimony in this case, and quite the usual amount of contradiction. Many important questions have been raised and discussed, which need not, in the view I take of the case, be decided. According to the Santiago's statement, she was about 400 yards above the Horseshoe buoy when the Scots Greys was about 200 yards below; and the collision occurred (as her libel asserts) 50 to 60 yards above. This may be accepted as true. Substantially, I think, it is true. The respective distances from the buoy may have been slightly different, and the point of contact may have been a few yards higher up; but not materially so. Both vessels were, I believe, towards the western side of the channel, when approaching the buoy. In this situation, what were their respective duties? To answer the question other circumstances must be understood. Between the vessels, for nearly, if not quite, half the distance, was a narrow, curving channel, across which a flood-tide was sweeping eastward, and over the flats on the Jersey side. The upward-bound vessel was heavily laden, drawing 21 feet of water, while the other was light, drawing 13½ feet. It is quite clear

that the ordinary rules of navigation, applicable to places affording ample sea-room, were not applicable here. What were the duties of the respective vessels, under these, unusual, circumstances, is a question which nautical experience alone can safely answer. Its importance seems not to have been fully appreciated when the testimony was being taken, and the attention of the experts examined, was not particularly invited to it. I have found it necessary to avail myself of the aid of assessors, therefore,—whose answers to interrogatories submitted, will be filed herewith.

In the light of these answers the following conclusions seem inevitable: The vessels could not pass at, or near, the buoy, without incurring serious risk. The Scots Greys, in consequence of her depth in the water, and the direction of the tide, tended constantly and strongly, to the eastern side of the channel; and her rudder, with the current astern, afforded only an imperfect means of counteracting this tendency, and controlling the vessel's course. She could not stop without encountering serious danger. It was necessary, therefore, to proceed, and by starboarding the wheel, keep as near the western side as practicable, until the buoy was passed. After this the wheel should have been changed, and the vessel straightened up on her course. The sheer required to round the curve would, however, carry her at least 100 yards—probably further—before it could be broken. She would thus be taken beyond the point where the collision occurred. As this is substantially, if not precisely, what she did, it follows that no fault can be imputed to her. If it be true, as charged, that she continued to starboard after passing the buoy, when she should have reversed—of which there is reason for doubt, —it did no mischief. In running the 50 to 100 yards, after passing the buoy, to the point of collision, the sheer with which she came around, was not, and could not be, materially changed. She had not yet time to straighten and settle on her course up the river.

This view derives support from the Santiago's witness, Captain Catharine, who, in answer to the question, "Do you know what the usual course is in coming down the river, and

going up, passing the buoy?" says: "It is just according to what position you are in; if you meet *near the buoy*, you have, one or the other, to slow down; because there is not room for both to go around safely at the same time, if both are large ships." Here the meeting was "near the buoy"—virtually *at it*. Which vessel should have "slowed down," under the existing circumstances, is not open to doubt. Drawing but 13½ feet of water, and moving against the tide, the Santiago had complete control of her course,—could stop, or go where she would, with comparative safety. It was, therefore, her duty to "slow down," until the Scots Greys had passed the buoy and straightened up; or, if she chose to take the risk of doing otherwise, to proceed along the Jersey side. Until the former vessel straightened up, it could not be known, with precision, where she would do so, even to her own officers. The safety of both vessels required that the Santiago should hold off until the situation of the other, when straightened up, was known. Failing to do so, she should be held to take the risk, and be answerable for the consequences, of doing otherwise: *The Galatea*, 92 U. S. 446. Her pilot, and others in charge, proceeded under the mistaken notion that they "had the right of way," and might "dictate" the Greys' course. They entirely ignored the peculiar circumstances of the situation,—the narrow, curving channel, the condition of the tide, and the consequent tendency to the Jersey shore, the size and draft of the vessels,—and proceeded as if the large ships involved were ordinary river craft, or the narrow channel an open sea. This appears not only from the testimony of her pilot, and others in command, but also from the libel filed in her behalf. In the latter it is stated that "the Santiago de Cuba kept on her course until she was near enough to do so, and then, while very far distant from the Scots Greys, she signalled to the latter that the vessels would pass to port, as was their duty, by blowing one whistle. She prepared thus to pass. The Scots Greys *was then making her turn before reaching the toe of the Horseshoe, where the vessels were likely to meet*, and seemed starboarding slightly. She gave no answering signal. The Santiago de Cuba waited a short time before

signalling again, confident that the Scots Greys, in pursuance of her plain duty, would port." Thus, while the vessels were likely to meet at the "toe of the Horseshoe," and while the Scots Greys was yet some distance below, the Santiago proceeded on her course, and signalled the Greys to port her helm and go eastward, ignoring the facts that the vessels could not pass at that point, without serious danger, and that the Greys could not port and turn eastward, when signalled to do so, without imperilling her safety.

A decree must be entered in favor of the Scots Greys for the damages sustained.

The court propounded certain questions to nautical experts called as assessors, which, with the answers thereto, were as follows:

*First.* Are you familiar with the Delaware channel opposite "Horseshoe shoal," and in that vicinity? *Answer.* We are familiar with the channel opposite the Horseshoe shoal, and in that vicinity.

*Second.* Supposing a steam-ship 300 feet long, loaded, and drawing 21 feet of water, to be passing up the river, about 200 yards below the buoy, with a flood-tide, and another steam-ship, 250 feet long, light, drawing $13\frac{1}{2}$ feet of water, to be passing down, about 400 yards above the buoy, what, under such circumstances, would be the duty of the respective vessels in regard to passing each other? In answering this interrogatory please to state—

(*a*) The width of the channel for each vessel, with the tide as indicated; (*b*) whether the vessels could safely pass each other, while rounding the shoal; (*c*) if they could, on which side the downward vessel should pass; (*d*) if they could not, which should stop, and allow the other to round first; (*e*) if the downward-bound should stop, how should the other round, —that is to say, should she endeavor to keep to the western side of the channel. State also how soon after reaching the buoy her wheel should be reversed to "straighten up," and how far she would probably run after reversing the wheel, before the sheer with which she came around, would be broken.

*Answer.* Supposing two steam-vessels, such as are described in this interrogatory, to be placed as therein stated, with the tide flood,—the upward bound would have the right of way, and the other must keep off. (*a*) The width of channel for the former vessel, with the tide as stated, would be about 375 yards. Drawing 21 feet, and running with the current, she should have 24 feet to give her any practicable command over her course. For the smaller vessel the channel would be considerably wider. (*b*) While they might, with great care, pass each other opposite the shoal, prudence would require the downward-bound vessel to stop, some distance above, until the other had passed the buoy and straightened up. (*c*) If the downward-bound did not stop she would take upon herself the risk of attempting to pass, and would have to keep over to the eastern side of the channel. (*d*) The reasons why the upward-bound vessel should have the right of way, and the other should stop or pass to the eastward, are as follows: The channel, for the distance of a mile or more below the buoy to nearly a like distance above, is rounding, being shaped like a broad horseshoe, with the toe pointing north-eastward. The tide when running up, sweeps across, and washes over the Jersey flats. A vessel deep in the water, and going with the tide, tends constantly and strongly, at this point, to the eastern shore, and, without considerable care, is in danger of going upon the flats. Her rudder, with such a tide, affords but a limited command over her course. She could not probably make precisely the same course twice out of a dozen trials. She cannot stop until around without serious risk. (*e*) Her safety therefore requires that she shall proceed, and endeavor to hug the western side of the channel, so as to resist the tendency of the tide to carry her beyond deep water, eastward. And this endeavor cannot, safely, be relaxed until the vessel is a short distance above the buoy. The wheel should then be changed to port to straighten the vessel up. The sheer will not be broken, however, under the circumstances stated, before the vessel has run her length, or more. She will therefore be, probably, 200 yards above and westward of the buoy, when she straightens.

*Sixth.* Could it be known, in advance, to those on board either vessel, what the position of the one bound upward, would be when she straightened up? *Ans.* Exactly what her position will be when she straightens, as before indicated, cannot be known until she accomplishes it. The downward-bound vessel will also encounter the tendency towards the Jersey flats from the effect of the tide, but being light and drawing seven and a half feet less water than the other, and having the tide towards her head, her command over her course is perfect, enabling her to stop or go where she will. If the upward-bound vessel should keep to the western side of the channel in rounding, the other could safely pass to the eastward, but the danger of attempting so to pass arises from the uncertainty of the former vessel being able to keep her course.

*Seventh.* If the downward-bound vessel should stop until the other rounded, should she start again before the latter straightened up? *Ans.* To guard against danger, therefore, when two vessels of such size are likely to meet at the buoy, or very near it, under the circumstances stated, the downward-bound vessel should stop a few hundred yards above, until the other has rounded and straightened up, when their position would be known to each other, and the course of the downward-bound vessel made plain.