THE FRANCONIA, her Tackle, etc.

(*Circuit Court, S. D. New York.* March 13, 1883.)

1. COLLISION — BOTH VESSELS IN FAULT—SUIT BY STRANGER — PROCEEDING JOINTLY OR SEVERALLY—APPORTIONMENT OF DAMAGES.

Where a tow attached to a tug is sunk by a collision brought about by the concurrent negligent acts of the tug and another vessel, the owner of the innocent tow or its cargo may proceed against the two vessels jointly, or either one of them severally, to recover his entire damages, and no apportionment of the loss between the offending vessels will be made, but the owner of the tow or its cargo may resort to either or both of the offenders for his whole loss.

2. SAME—EVIDENCE.

As the evidence in this case shows that while the tug was *grossly in fault* the other vessel contributed to the injury by her conduct she is liable to the owner of the tow and its cargo for his loss.

3. SAME.

    In such a case it suffices if the libelant shows that the conduct of the vessel proceeded against contributed to his loss, although the other vessel was grossly in fault.

4. SAME—RAISING VESSEL—DUTY OF OWNER.

    It is not generally incumbent on an owner, when his vessel has been sunk by a collision, to go to any expense whatever for the purpose of raising her.

In Admiralty.

The libelant was the master and owner of the canal-boat Hope, which, together with her cargo, was lost by a collision with the steamer Franconia, on the twenty-sixth day of November, 1878. The canal-boat, carrying a cargo of coal, was in tow of the tug Markle, and was lashed to her side. The tug was a small vessel, and the canal-boat projected beyond the tug's bow some 30 feet. The collision took place in the East river, just above Hell Gate, off Ward's island, about 300 feet from shore, at a point nearly abreast the inebriate asylum. The tug and tow were bound eastward, and the Franconia was coming from the eastward. The tug and tow were going with the tide, which was running about four miles an hour, and the tug was making, with the tide, six miles an hour. She rounded Negro Point at the time the steamer Franconia, on a south-east course, had passed Sunken Meadow, and was opposite the north-east point of Ward's island. The steamer was making about six miles an hour against the tide. The two vessels should have seen each other half a mile off, from their relative positions. Both had their lights burning and in proper order, but, irrespective of the lights, although it was still dusk, it was light enough for the vessels to see each other, being just before daybreak. The navigable channel is over 200 yards wide at the narrowest point between Negro Point and Sunken Meadow. The tug, when she rounded the point, kept over towards the Long Island shore and was eastward of the middle of the channel. The steamer was westward of the middle of the channel. The vessels were on courses probably not much more than 100 feet apart, the Franconia's course being on the port side of the tug.

Whether the vessels observed each other until they were within three-eighths of a mile or less, is not clear, but each did see the other when that distance apart. The man at the tug's wheel says he saw both lights of the Franconia at the same time, while, on the part of the Franconia, the testimony is that when first seen the red light of the tug was a point or so on the Franconia's port bow. The wheelman of the tug wanted to pass on the starboard side of the steamer, thinking the tug could better control her tow on that side, owing to

the tide, and as soon as he discovered the Franconia blew two whistles, and, without getting a reply, starboarded his wheel and headed for the Ward's island side of the channel. The Franconia did not hear this signal, though her mate and master were in the pilot-house, and two men were stationed forward on the lookout, but kept her course. The men of the Franconia were doubtless somewhat occupied in observing the schooner Duryea, which was about a hundred yards in advance of the Markle, bound eastward, running on a northeast course, and was on the port quarter of the Markle. She evidently wanted to pass inside the Franconia, and the latter starboarded slightly to give the schooner a wider berth, passed her on her starboard side, and parted again to recover her own course. At this point of time the tug, which had kept on under her starboard wheel and had been swinging over towards the Ward's island shore, put her wheel hard starboard and blew two whistles. The vessels were then not more than 300 feet apart. The tug was heading sharply across the steamer's bow. The steamer responded with a single blast of her whistle, and then immediately reversed her engines, but struck the tug on the starboard bow near the stem, and then the tow, parting their fastenings, and injuring both so that they sunk within 15 minutes. She had a double engine and readily obeyed her helm, and at her ordinary speed could reverse and avoid a collision by proper exertion when 300 feet distant. Against the tide she could have completely reversed within 250 feet. The Franconia proceeded on her way without stopping to render assistance. The crew of the tug and tow were rescued by the boat of the schooner Duryea. The value of the Hope, her furniture, cargo, and freight money, with interest to the time of the decree in the district court, amounted to the sum of $2,329.33.

*Edward D. McCarthy*, for libelant and appellee.

*Beebe, Wilcox & Hobbs*, for claimant and appellant.

WALLACE, J. If there was any fault on the part of the Franconia which contributed to the injury of the libelant's boat, the libelant, as the owner of the tow and innocent of fault, is entitled to pursue the Franconia. Assuming that the tug was primarily responsible for bringing about the situation in which the collision took place, the steamer must, nevertheless, respond to the libelant for the damages he sustained, if the exercise of due care upon her part would have prevented the ultimate consequences. At law, the party injured by the concurring negligent acts of two or more wrong-doers may pro-

ceed against all of them jointly, or any one of them severally, and
recover his entire damages. And, as to an innocent tow, or as to
cargo not owned by one of the two offending vessels, the same right
exists in admiralty, and an apportionment of the loss on principles
of admiralty between the offending vessels will not be made, but the
owner of the tow or the cargo may resort to either or both of the
offenders for his whole loss. *The Atlas*, 93 U. S. 302; *The Alabama*
*and Gamecock*, 92 U. S. 695.

There was no possible excuse for the collision here. Both the tug
and the steamer should have seen each other and regulated their con-
duct, in view of the situation, when they were half a mile apart. They
were in a dangerous channel, with a strong tide, but had abundant
room and opportunity to avoid a hazardous conjuncture. They did
see each other, at a time when it was sufficiently light to observe each
other's movements accurately, when they were three-eighths of a mile
apart, if not further. That the tug was in fault, and reprehensively
so, in making for the starboard of the steamer, contrary to the usual
custom of navigation of the river, and without waiting for the steamer's
assenting signal to such a course, cannot be doubted, and is not se-
riously disputed. But the proofs are cogent that the tug made for
the steamer's starboard and maintained this course from the time
she gave the first two blasts of her whistle, and when the vessels
were at least a quarter of a mile apart. As the steamer then had
ample time and room to avoid collision, if she had noticed the tug's
movements, it must follow that she was culpable, unless there was a
later and sudden change on the part of the tug which the steamer
had no reason to anticipate, and when it was too late for the steamer
to act judiciously. It was peculiarly the duty of the steamer to be
vigilant, as she was proceeding against the tide, and her movements
could be more readily controlled than could those of the tug. *The*
*Galatea*, 92 U. S. 439. The proofs do not show such a sudden change
of course on the part of the tug. That she put her wheel hard star-
board when within 300 feet of the steamer, supposing a collision to be
otherwise unavoidable, and thereby threw herself more directly across
the steamer's bow, is true. Possibly, if she had not done this, there
would not have been a collision; but the steamer, as well as the tug,
was in fault for permitting a situation to exist which was so hazard-
ous that an error of judgment on the part of either vessel might prove
fatal.

The truth, probably, is that the steamer saw the tug first after the

latter rounded the point, and before she concluded to go to the steamer's starboard; that the steamer relied upon the tug's observance of the usual custom of keeping to the right when meeting a steamer at that part of the river on the flood-tide, also upon the observance of the rules of the supervising inspectors which enjoined that duty upon her in the absence of signals given and responded to the contrary; and relying upon this conduct on the part of the tug, and assuming from the tug's position that she did not require special observation, the steamer's attention was directed to the schooner Duryea, until, passing that vessel, her attention was again directed to the tug, when it was too late for cool action and careful judgment on the part of either the tug or the steamer. This theory is cogently enforced by the fact that the steamer did not hear the signals of the tug when the latter first concluded to pass on the steamer's starboard; signals which certainly were given, and which the steamer ought to have heard. If, when she ported while passing the Duryea to regain her former course, the steamer had observed the tug with care and had starboarded, the collision might have been avoided. Not having done this, although the collision might not have taken place without the tug's further error, the steamer was in fault because she assisted in bringing about a critical situation in which an error of judgment on the part of either vessel might be expected and could not be repaired.

Resting the decision of the case upon this view of the facts, it is unnecessary to inquire whether there was further fault on the part of the steamer which contributed to the collision. As the tug was grossly in fault, if this were a controversy between her and the steamer she would be held rigidly to the rule requiring a vessel guilty of negligence to show affirmatively that the collision was not the consequence of her own negligence. The libelant, however, occupies the position of a stranger to the tug, and it suffices if he shows that the conduct of the steamer contributed to his loss.

There is no merit in the point made by the appellant that it was the duty of the libelant to raise his boat if practicable after she sunk, and, not having done so, cannot recover upon a theory of a total loss of boat and cargo. There is no peculiar state of facts disclosed by the proofs to impose on the libelant the duty of an attempt to raise the boat and cargo. At the place where the boat sunk the water was so deep and the current so swift that it was highly probable that such an attempt would only subject the libelant to an additional loss. It is not generally incumbent upon the owner, when his vessel has been sunk by a collision, to go to any expense whatever for the purpose of

raising ner, (*The Columbus*, 3 W. Rob. 158,) and the facts here do not present an exceptional case.

The decree of the district court is affirmed, with interest upon the damages and costs.