CANFIELD *et al.* *v.* THE F. & P. M. No. 2.

*(District Court, E. D. Wisconsin.  January 5, 1891.)*

COLLISION—BETWEEN STEAMERS—BEND IN RIVER—DUTY OF ASCENDING BOAT.
    Where an ascending propeller, while approaching a narrow and dangerous bend in the Manistee river, receives notice that a steamer is entering the bend from above, it should wait until the other has descended, and if it attempts to pass in the bend, and a collision occurs, it will be held in fault.

In Admiralty.
*T. J. Ramsdell* and *Shepard, Haring & Frost*, for libelants.
*Mr. Kremer* and *Mr. Hoyt*, for respondent.

JENKINS, J.   On the forenoon of the 19th day of October, 1887, the steam-barge James H. Shrigley, and the propeller F. & P. M. No. 2, collided in the Manistee river, and the question of the fault of such collision, if fault there was, is the subject of inquiry here.   Manistee river is an outlet for the waters of Manistee lake, and, at a distance of two miles therefrom by the course of the river, empties into Lake Michigan. At a distance of one-half to three-fifths of a mile from its mouth there is an

[1]11 Fed. Rep. 918.

abrupt bend in the river to the north, of about 45 degrees from its previous south-westerly direction. To the north of the bend the land is level for a distance of 70 feet, thence rising, within a further distance of 100 feet, to an elevation of some 70 or 80 feet. There sand-hills obstruct the view, so that steamers approaching each other from opposite directions have not sight of each other for the full distance of half a mile; but, within a distance of perhaps 1,500 to 2,000 feet, the spars of the approaching steamer may be seen by the other, the hull of the one being visible to the other only when within a few hundred feet. The life-saving station is located upon the north bank of the river, about 1,000 feet below the knuckle of the bend, and above the bend, and upon the same bank, and within a distance of 1,400 feet therefrom, are several docks. On the south bank of the river, and just below the bend, are Canfield and Wheeler's dock and salt shed, and from thence a boom extends up the river, 1,000 feet or more. A shoal puts out from the north bank around the knuckle of the bend for a distance of 60 feet into the river. There is also low water outside of the boom line for a distance of 15 to 20 feet, so that the available channel around the bend for vessels drawing 10 feet of water, or over, is quite narrow,—not over 80 feet in width. The deeper water is found at the south side of the channel, where it is some 12 feet in depth. Below the bend the river is 200 feet in width, with a depth of water at the docks of 18 feet. The current of the river varies in its rapidity with the seasons of the year. At the time of the collision it was between two and three miles an hour. The Shrigley was a vessel of 388 tons burden, 175 feet in length over all, and drawing 10 feet forward and 11 feet 6 inches aft. The No. 2 was a vessel of 658 tons, 190 feet in length over all, and drawing between 3 and 4 feet of water forward, and 10 feet 8 inches at the middle, and 10 feet aft. There were at this time three vessels lying at the dock on the north side, below the bend, and one at the salt dock on the south side. The vessels met in the bend, and there collided. Before either vessel had reached the bend, the Shrigley, descending the river, and while above the boom, gave two blasts, indicating her desire to pass on the south side of the river. The F. & P. M. No. 2, below the bend, and near the life-saving station, answered with a signal of one blast, whereupon the Shrigley repeated her signal, and the No. 2 answered with two blasts, assenting. It is not necessary to go into particulars in regard to the collision itself, except to say that the F. & P. M. No. 2 attempted to pass the Shrigley in the bend, passing to the north side of the river. Seeing a collision inevitable, the master of the F. & P. M. No. 2 backed his engine, the bow of his boat swung to starboard, and came into collision with the Shrigley.

Rule 5 of pilot rules for lakes and sea-board provides:

"Whenever a steamer is nearing a short bend or curve in the channel, where, from the height of the banks, or some other cause, a steamer approaching from the opposite direction cannot be seen for a distance of half a mile, the pilot of such steamer, when he shall have arrived within half a mile of such curve or bend, shall give a signal by one long blast of the steam-whistle, which signal shall be answered by a similar blast, given by the pilot of any approaching steamer that may be within hearing. Should such signal be so

answered by a steamer upon the further side of such bend, then the usual signals for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such pilot be not answered, he is to consider the channel clear, and govern himself accordingly."

There is no charge or proof here, either in the libel, answer, or evidence, of failure by either vessel to have timely given this signal. The court is bound to assume, therefore, that each vessel complied with the regulation. Assuming that the signals were given, each vessel understood that the other was approaching. The F. & P. M. No. 2, being the ascending vessel, was bound, if necessary, to stop, and avoid the descending vessel, as her movements could be controlled with less difficulty than those of the descending steamer. *The Galatea,* 92 U. S. 439. It was perhaps possible, under favorable circumstances, for two vessels to have passed each other in the bend, but it was hazardous. It was negligence unnecessarily to make the attempt, each vessel having timely warning of the other's approach. Prudence dictates that the ascending vessel should stop and place herself out of the strength of the current, permitting the descending vessel, carried along by force of the current, full swing around the bend.

Even upon the assumption that the signal required by rule 5 was not given, it satisfactorily appears from the evidence that the F. & P. M. No. 2, upon receiving the first signal of two blasts from the Shrigley, could have safely stopped, and should have stopped. She should not have incurred the unnecessary hazard of collision in the difficult passage of the bend. In this she was negligent. She was then 1,000 feet below the bend. There was sufficient opportunity to avoid all danger of collision. Proceeding in the face of a known danger, she negligently placed herself in a position where she was likely to inflict injury, and should respond for the consequences of her negligence. A decree will be entered for the libelant.