## THE ANNE E. VALENTINE.

*(District Court, E. D. Virginia.  December, 1884.)*

1. COLLISION—VESSELS DESCENDING AND ASCENDING JAMES RIVER.
   Ascending vessels about to meet descending vessels in that part of James river above City Point, when the tide is in ebb, must steer close to one or the other edge of the channel, and leave as much room to the descending vessels meeting them as practicable.

2. SAME—FAULT—DAMAGES.
   When it is not clearly proved that an ascending vessel has thus given room to a vessel meeting her, and a collision occurs, damages will not be awarded to the ascending vessel.

In Admiralty.

*Meredith & Cocke*, for libelant.

*W. W. & B. T. Crump*, for respondents.

HUGHES, J.  The collision under investigation happened in James river just below the mouth of Almond creek, which is a little below the wharves of the Chesapeake & Ohio Railway Company.  Although the river there is wide, the channel is not more than 200 feet between the buoys.  The collision under consideration occurred about 9 o'clock on the night of the thirtieth of April, 1884.  It was a clear night.  A new moon was shining.  The tide was in ebb.  There was a tow coming up the river, drawn by the tug Frank Sommers, with a small tug, the Petersburg, in front of her, helping.  They had three vessels in tow, namely, the brig Bonito, of 223 registered tons, with 25 feet breadth of beam, drawing 9 feet 3 inches of water; the schooner Gaskill, about as large, but broader in beam; and a small schooner in the rear of the Gaskill.  The tug Ajax was going down the river, having the schooner Anne E. Valentine in tow.  The Valentine drew 10 feet 8 inches of water, and was loaded.  Her breadth of beam was 32 feet.  The two tugs duly signaled each other' in approaching, to pass to the right.  As the Valentine was passing down, and when between the Sommers and the Bonito, she took a sheer to port and soon came in collision with the Bonito.  The hulls of the two vessels do not seem to have come in contact.  Just before coming abreast the Valentine seems to have righted herself from the sheer she had taken sufficiently to have cleared the Bonito.  She

would have cleared, but for the fact that her port anchor, which projected considerably beyond the bow, caught in the forward rigging of the Bonito, just above her port bulwarks. The result was that the bulwarks of the Bonito were torn away from the topmast backstays down to the poop, and that a good deal of damage was done, chiefly on deck and above decks. See Capt. Koch's answer to the twentieth question in chief. The damage claimed is about $1,300. I am to say, from the evidence, whether the Bonito or the Valentine was in fault on the occasion.

If the Sommers was steering close to the northern edge of the channel, and if each of the vessels which she had in tow was in line with her, and close on the same side of the channel, there was no fault on their part. The question in this case is whether or not the Bonito was reasonably close to the northern side of the channel at the time of the collision. The *law* of navigation, prescribed under the sanction of congressional statute, for the western rivers, is that when two boats meet in the narrow channel of a river it shall be the duty of the pilot of the ascending boat to make the proper signals, and, when answered by the descending boat, to lie as close as possible to the side of the channel; and that the descending pilot shall cause his boat to be worked slowly until he has passed the ascending boat. We have no positive *law* of similar purport prescribed for the navigation of our eastern rivers, but reason and prudence, equally on these as on western rivers, require the ascending boat to give the way in a narrow channel to the one descending, and courts of admiralty are obliged in their rulings to insist that this shall be done.

In the case at bar the tide was going out, and the natural downflow of the James river very materially increased the current. A vessel going down stream on a strong current is very little under the influence of her helm, and is liable to take "sheers," not only in shallow places, but under the action of cross or "switch" currents, which cannot be known or foreseen by the pilot. The ascending boat, on the other hand, is obedient to her helm, especially when under the tow of a tug, and she can choose her course with tolerable precision and certainty. It is consequently her duty to leave as much of the channel as practicable to the descending vessel. In the present case the Valentine was entitled to as wide a breadth of channel as could conveniently be allowed her by the up-coming vessels which she was to pass. The real question to be dealt with is, therefore, whether or not the Bonito gave to the descending vessels all the room which was not needed for her own safe and convenient navigation.

The tug Sommers is proved to have been as near to the buoys on the north of the channel as she could or ought to have been. The Gaskill is also proved to have been well up to the northern edge of the channel and steering after the Sommers. But the evidence in regard to the position of the Bonito, which came between the Sommers and the Gaskill in the tow, is conflicting. If there was none but the

testimony of the respective crews of the two colliding vessels in this case it would be impossible to arrive at the truth of the matter with any judicial certainty. The two sets of witnesses contradict each other at every point. We can get at the truth, if at all, only from other testimony, and from such circumstances as appear to bear upon the point at issue.

. Of all the witnesses, of either colliding vessel, who testified, the one most competent to testify as to the position of the Bonito just before and at the time of the accident was Capt. Gaskill, of the schooner Gaskill, which was next in rear of the Bonito in the same tow. He testifies, with iteration and emphasis, that in steering his own vessel by the lights of the tug Sommers he could see these lights to the starboard (or the shore side) of the Bonito. This brig was but partially loaded, and stood high out of the water, and would have obscured the lights of the tug if she had been in line, with helm a-port, as close as the tug and the Gaskill were to the edge of the channel. Capt. Gaskill expressly says that, fearing his helmsman was steering by the brig and not by the tug, he took the wheel himself and put his vessel after the Sommers. He would not say how far off to port in the channel the Bonito was, but he was persistent in saying that she was off far enough to allow of his steering by the lights of the tug, seen to the starboard of the Bonito.

It is also proved that, after the collision, the Ajax immediately slipped her hawser, and that the Sommers did not do so, but continued to pull on hers. She thus prevented the Bonito from moving further towards the southern edge of the channel than when the accident occurred. The concussion of the Valentine against the Bonito would also tend to drive the latter further towards the northern edge. Therefore the Bonito could not, after the collision, have got nearer to the southern edge of the channel than she was at the time of it. Yet the evidence is positive that the Gaskill, a large schooner of broader beam than the Bonito, passed up in tow of the Petersburg on the starboard side of the Bonito, between her and the north edge of the channel, just after the accident. The Gaskill was of at least 30 feet beam, and the additional room which she must have had on that side of the channel on her passage up must have been as much more; and therefore it would seem that the Bonito must have been near the middle of the channel at the time she was raked by the Valentine's port anchor, the channel being only 200 feet in width of deep water. Moreover, it is proved in evidence, by Capt. Koch, of the Bonito, that he did not put his helm hard a-port until half a minute before the collision. His brig being, as I suppose, near the middle of the channel, it was his duty to hard-port his helm as soon as the two tugs blew to pass to port, and to hold it hard a-port until he had got near the northern edge. He did not do this at the time of the signal, nor even when the Ajax passed him, nor until half a minute before the Valentine came in contact with him. The two vessels

were approaching each other at the rate of nine to ten miles an hour, or 800 feet a minute, and the helm of the Bonito could not have thrown her from the middle to the edge of the channel in half a minute, or even far enough towards the edge to avoid the sheer of the Valentine.

On the whole evidence, I think the case made is that the Bonito was near the middle of the channel; that she was not reasonably near the starboard edge of it, as she ought to have been; and that she ported her helm to get there too late to be thereby out of the way of the Valentine, as she was bound to be.

Vessels coming up the portion of James river above City Point, on ebb-tide, are in better subjection to their helms than vessels going down; and I shall invariably rule that up-coming vessels, when about to meet descending ones in narrow places in this river, on ebb-tides, must keep as near that edge of the channel which has been indicated by signals and leave as much room to the descending vessels as practicable. This rule must, of course, be construed in connection with the correlative rule that the descending vessel must observe a proper caution and diligence in exercising its right of way. See, as to this latter point, the case of *The Katy Wise*, 3 Hughes, 589, decided by me at Alexandria in 1879.

The libelant in the case at bar has not established fault in the Valentine by affirmative proof reasonably conclusive of the fact. On the contrary, the weight of evidence seems to show that his own vessel, the Bonito, was in fault in being near the middle of a narrow channel, on an ebb-tide, and not having hard-ported her helm in time to get near its edge.

Decree must be for the respondents.