THE YUMA.

(District Court, W. D. New York. September 4, 1902.)

1. COLLISION—VESSELS MEETING—STEAMER AND SCHOONER IN TOW.
    Evidence considered, and *held* to show that a steamer passing up the St. Clair river and a schooner coming down in tow were both in fault for a collision in which the schooner was sunk,—the steamer for sheering to starboard, toward the course of the schooner, after passing the ship having the latter in tow, and in failing to take timely action to keep at a greater distance after the exchange of passing signals, which she might safely have done; and the schooner for the same reason, it appearing that she did not promptly change her course, as did the steamer having her in tow, which was exonerated from fault.

In Admiralty. Suit and cross-libel for collision.

Goulder, Holding & Masten, for libelants.
Shaw, Waite, Cady & Oakes, for claimant and respondent.

HAZEL, District Judge. The original libel in this cause was filed against the steamship Yuma to recover damages arising out of a collision in St. Clair river on September 21, 1900, at about 7:30 o'clock p. m. The navigable channel is 700 feet wide at this point in question. The Yuma collided with the two-masted schooner John Martin, which was in tow of the steamship Morris G. Grover. A cross-libel has been filed on the part of the Yuma against the Grover. The impact almost instantly—within 20 seconds—sunk the Martin about 40 feet from the range line, in about 50 feet of water, resulting in loss of ship, cargo, and four of the crew, including her captain and mate. The lives of others of the crew were saved by aid rendered from the shore and by the Yuma. The chief injury sustained by the Yuma was to her starboard bow. After rendering assistance to the Martin's crew, her bow was swung over to the port or west bank, which is the American side of the river, near the place of collision. The Grover and Martin in tow were bound down from Two Harbors to Lake Erie. The Grover, 287 feet long, carried about 2,500 tons of iron ore, her draft being 17 feet 10 inches. The Martin was 220 feet long, with 1,600 tons of iron ore. The towline was 900 feet long, and, although it is alleged by the answer to the libel and by the cross-libel that both the Grover and Martin were in fault for not shortening it before entering the channel, the alleged fault is not pressed, and no proof was given to establish it. The three vessels were stanch, strong, and were well manned and equipped. The night was clear and starlight, with a light southwest breeze. The electric lights at Ft. Gratiot partly illumined the locality where the collision occurred. The signal lights of the

approaching vessels were in their proper places, and fully visible. The Grover, in addition to her regular lights, carried a light indicating that she had a tow, and a steering light for her tow abaft her funnel. Five-mile currents in St. Clair river flow parallel to the Ft. Gratiot light, and also turn to the westward thereof. This current and strong eddies running upstream from below the point of collision require the exercise of skillful and prudent navigation by vessels passing each other in opposite directions on the American side, or between the range line and west channel bank. The course of the river is nearly north and south. Where the Grover and Yuma encountered each other the range line is 350 feet from the visible, and about 300 feet from the channel bank. It is entirely safe for vessels properly and carefully navigated to pass each other at this point. No difficulty to safely pass in opposite directions was apprehended by either vessel. The Yuma, 322 feet long, laden with coal, was ascending the channel on the west, or American, side, guided by the Ft. Gratiot light, about two points on her port bow. She had easy and perfect control of her movements. The Grover and Martin were descending. The Grover was admittedly to the eastward of the course of the Yuma, while that of the Martin is in dispute. The distance between the Grover and Martin and the shore is in conflict. As to the former, the master of the Yuma says, "The Grover came on down past us at a reasonable distance away, so much so as to give me no anxiety in regard to her movements." He also testifies that the collision with the Martin occurred probably 175 or 200 feet from the shore. The Yuma, not wishing to overtake an up-going tow,—the Hurlbut and Clint,—had reduced her speed to 2 miles per hour over the land and 7 miles through the water. On the whole evidence I have become well satisfied that the distance between the Grover and the Yuma when abreast was in the neighborhood of 150 feet. The Grover passing a little to the eastward of the range line, and about 350 feet from the shore, there was ample room for the Yuma to safely pass the Grover, and she was, therefore, not hampered in her movements, nor crowded to the shore. Her master regarded it as a safe and perfectly proper place to pass. The Grover and Martin were descending southward with the current at the rate of 7 miles per hour through the water and 12 miles over the land, and therefore they had the right of way against the Yuma. The Galatea, 92 U. S. 439, 23 L. Ed. 727; The Dasori (D. C.) 47 Fed. 330; The Anne E. Valentine (D. C.) 22 Fed. 620.

The facts of the collision are these: As the Grover and Martin came down and approached the Ft. Gratiot light, the entrance to St. Clair river, reaching a point 500 feet northerly of the Fontana wreck, which lies in mid-channel about 1,000 feet above the point of collision, the master of the Grover sounded two blasts of the whistle to the up-bound Yuma, then below, indicating that she desired to direct her course to port, and to pass the ascending steamer at a safe distance to starboard, and on her east, or Canadian, side. The Yuma, having heard the signal, replied with two blasts of her whistle, indicative of her assent, and that she likewise would direct her course to port, taking the west, or American, side of the channel. A spe-

cial rule in navigation, promulgated by the department of war, dated August 6, 1900, requiring down-bound vessels to pass to the westward and up-bound to the eastward of the Fontana wreck, was not followed. This point is not urged. The Grover disregarded this regulation by her signal, and the respondent assented. The signals of the Grover and Yuma to pass at this point, with regard to each other's safety, were perfectly understood. The Yuma maintained her reduced rate of speed until a few seconds before the actual collision, when she starboarded and increased the revolutions of her propeller wheel to avoid the impending disaster. The impact of the two moving bodies with terrific force on an angle of about two points was then inevitable. The Grover, prior to signaling the Yuma, and when about one-half mile above the Ft. Gratiot light, passed an up-bound tug with tow. She then sounded two blasts of her whistle to another upbound tow, which proved to be the steamer Hurlbut and schooner Clint. This tow was on the west side of the channel. The Grover passed the Hurlbut 50 feet above the Ft. Gratiot light, and, proceeding down, came abreast of the Clint on her starboard with the Fontana wreck on her port side. She was then 100 feet west of the wreck, and about 75 feet to the eastward of the Clint. When abreast of the Fontana wreck, the Grover starboarded one-half or three-quarters of a point, which brought her to the eastward of the Ft. Gratiot ranges, coming abreast of the Yuma in about one minute after passing the Clint. Capt. Mooney says they came abreast starboard to starboard 150 feet apart between 400 and 800 feet below the Ft. Gratiot light; that he stood on top of the pilot house, and when abreast of the Yuma's pilot house, which is aft, he suddenly heard her master exclaim "hard astarboard!" and also heard a signal given to the engineer to increase her speed, but, on looking aft, saw that she had crossed the Grover's stern. The libel specifically alleges as fault on the part of the Yuma: (1) That those in charge of her navigation were incompetent and inattentive; (2) in swinging to starboard and toward the schooner John Martin, after passing signals of two blasts had been exchanged; (3) in not keeping to starboard while approaching and passing the Martin; (4) departing from her course, and striking the Martin. Libelant's testimony is solely directed upon this issue to place the responsibility for the collision. It is not claimed that the Yuma should have remained below to allow the Grover's tow to pass down. There was ample space between the navigable channel bank and the range line. The Yuma proceeded at as moderate speed as the situation required. The strength of libelant's contention rests on the Yuma's failure to exercise such care as the surrounding circumstances required. The Yuma, as contended by libelant, was permitted to swerve or sheer from her proper course. Instead of displaying the attention required by the situation, unmindful of concealed dangers and obstacles and a steady and even upbound course, the Yuma lost control of her propeller wheel, and yielded to the rapidity of the current. A sheer to starboard resulted in carrying her across the Grover's stern towards the towline of the Martin, then striking the Martin in the forward rigging. After examining the evidence, I have reached the conclusion that the Yuma

is in fault for sheering to starboard towards the Martin away from her course, and thereby contributing to the collision. This was owing to inattention by those in charge of her navigation. The conclusion I believe to be supported by the evidence and surrounding circumstances, and therefore she must be held in fault. The Sagua v. The Grace (D. C.) 42 Fed. 461. Weaver, watchman of the Grover at the time of the collision, was in a favorable position to observe the movements of the Yuma, as well as to form an estimate of the distance separating the two steamers. Witness Losie, who stood on the beach a short distance above the point of collision, about abreast of the Yuma's engine house and from 250 to 300 feet distant; and Church, the witness for libelant, who stood on the beach a short distance below the point of collision,—were in a like situation. Weaver testifies that he saw the Yuma when her bow was amidships of the Grover, and, as he turned to look aft, he saw the port and starboard lights of the Martin. He says the Yuma began sheering when her bow was abreast of the Grover's stern, and that she was closer to the Grover than passing vessels usually are. He observed she was about 35 feet closer to the Grover's stern than her bow. Instantly, he says, the green light of the Martin was shut out. Just before the impact he again saw her green light, and when within an instant it was again shut out. Losie testifies that he saw the Yuma sheer out and heard a crash. He explains that he was not in a position to see the Martin sheer because she was directly opposite to where he stood on the beach. Church also stood on the beach a short distance below the point of collision. He says the Yuma seemed to sheer, and seemed to be out in the river as far as the range line. Christner, a marine reporter, who, just prior to the collision, was engaged in delivering newspapers to the Grover from a boat as she passed down, testifies that he noticed the Yuma sheering to starboard towards the Martin, and he called to the master of the Grover. At this time he was on the port side of the towline, and in an excellent position to observe the Yuma's course. He says that to the best of his judgment her bow was sheering 60 or 70 feet, and she struck the Martin in the forward rigging on the starboard side, and at the instant of the impact the Yuma's engine bell rang. I am much persuaded by this testimony. No substantial reason is suggested why it should be disregarded. Testimony of other witnesses was to a similar effect. I deem the proofs sufficient to establish an unjustifiable sheering to starboard by the Yuma, notwithstanding the testimony of the respondent's witnesses that the Yuma did not sheer, and that the collision happened solely on account of the Martin's sheering or sagging and appropriating the course of the Yuma. Testimony for the respondent on this point further tends to establish that, when the Yuma unexpectedly ascertained danger to be imminent, she immediately swung to port in obedience to the commands of her master. As I am of opinion, for the reasons stated, that the Yuma sheered, it is an evidential inference sufficiently clear to outweigh the testimony of the respondent that she did not promptly obey her starboard wheel. Her sheering and the rapidly flowing current were undoubtedly impediments sufficient in themselves to re-

tard swinging quickly and accurately to port. Had she swung seasonably to port (which she could have done without danger to herself), or held her helm with necessary directness to starboard, she could not be held in fault. Her unexpected sheering was, under the circumstances, an occurrence not unlikely. The passing of the heavily laden steamer and tow, the rapidity of the current, the existence of eddies, and the proximity of the passing ships are all strong circumstances which should have admonished the Yuma that a firm starboard helm was required while passing the tow.

The movements of the Martin and the course which she assumed to take must now be considered. The answer and cross-libel of the respondent charge negligent navigation of the Grover and Martin as the sole cause for the collision. The alleged faults to which respondent's testimony is directed are: (1) That the Grover was in charge of inattentive and incompetent officers and men; (2) navigating well to the American side of mid-channel; (3) in not allowing for the leeway or drift of the Grover's tow. The schooner John Martin is particularly claimed to have been at fault: (1) For not having her towline properly shortened before entering the Narrows; (2) in not allowing for the leeway or current at that place, and in not navigating accordingly; (3) in not directing her course more to port as she was approaching and well up from the Yuma; (4) in wrongfully departing from her proper course, and in running over and into the Yuma, she having abundant room on her port hand. There are many ways in which the collision may have happened. Sheering from their course by either or both vessels, or the Martin swinging across the channel, in disregard of the Yuma's right as an ascending vessel, are cases toward which the testimony is chiefly directed. It was dangerous, on account of darkness, for the Yuma at this point to proceed up the river nearer the dock or shore line than 150 feet. An examination of all the testimony seems to establish that the Yuma was at least 200 feet from the dock or shore line when abreast of the Grover. It is not clear that she would have encountered any dangers had she acted upon the necessity, which became apparent before coming abreast of the Grover, of diverging sufficiently from her straight course to safely pass the approaching Martin. Her course, however, was not altered, because the master of the Yuma believed that the Martin would turn out, and more closely follow in the wake of the Grover. Ordinarily, he would be justified in so believing, but the character of the channel at this point with its five-mile current was well known. The Martin was deeply laden, and a straight course of a tow going with a strong current (for such it was) is often interfered with. He ascribes the collision to the sheering of the Martin to starboard and from his course. Counsel for the respondent earnestly contends that the Grover as well as the Martin was off the course which each had elected to take; that both vessels were too far to the westward to secure safe passing to the Yuma. The soundness of this contention, as to the Grover at least, is not borne out by the proofs, for, as already stated, the passing distance between the Yuma and Grover was not unusual, nor in any degree hazardous. It gave the Yuma no anxiety. In the judgment of Capt. Buie, assuming the Martin to have been properly navigated, the

Grover, in coming so close to the Yuma, gave the tow no chance, due to the current, to keep sufficiently over toward the east and in the wake of the Grover. Capt. Buie says:

"I saw the tow heading for us,—the consort,—but at the time I was abreast of the Grover I realized the schooner ought to be straightened down the river, but she crossed the line of my course. Then I saw something desperate was liable to happen, and I rung our engine up strong, first ordering the wheelsman 'Hard astarboard,' with the hope of throwing our boat on the bank to avoid the collision; but we came together on an angle of probably a point and a half."

This testimony justifies the presumption that before coming abreast of the Grover he saw her heading for him. Both of her lights were open to his view. Why not starboard then? Why wait until the ship was abreast of the Grover in a parallel course? He believed it prudent to continue in an unhampered course, believing that the Martin would turn to starboard. The inquiry, therefore, seems to be relevant whether the Yuma, irrespective of her sheering, was not in fault for her failure to guard against an obvious danger. A judicious and timely movement on her part to port before coming abreast of the Grover would have avoided the collision. As she was 200 feet from the dock, this could have been done with safety.

As to the fault of the Martin, it is quite true that the men at the helm (Kyle, and Peterson, who stood by) testify that the Martin followed the Grover under starboard helm, and was steering on her port quarter. Kyle says that the Martin, when passing the Hurlbut and Clint was 100 feet to starboard. This I believe to be error. The distance apart was perceivably less. Giving consideration to the manner in which the colliding vessels came together, the distance of the Martin from the range line, the manner in which she lies at the bottom of the river, the testimony of Peltier leaves little doubt of the fault of the Martin. She was too far west of the Grover's course. For some unexplained cause she was not following closely enough in her wake. Having heard the passing signals, she knew of the approach of the ascending steamer. Her master is presumed to have known of the tendency of passing vessels to sheer, and undoubtedly knew the current to be westward. Her duty, in the circumstances, was to steer further to the eastward. Failure so to do was a fault. Parsons, master of the steamer Hurlbut, witness for respondent, testified that both the Grover and Martin passed him from 50 to 75 feet to starboard. Peltier, master of his tow, the Clint, testifies that the Grover passed him to starboard from 75 to 100 feet distant, the Martin about 25 to 30 feet closer. He heard a "starboard" order given by the Martin after leaving his stern. It would seem, therefore, that an attempt to follow the Grover was not seasonably made, for the collision was then inevitable, and occurred within one minute thereafter. I have given the testimony bearing upon the distance which the Martin was to the westward of the Grover careful consideration. As a whole, I think it justifies the conclusion that the Martin passed down too far to the westward. The inference to be adduced from the testimony does not permit finding that she was actually in the course of the Yuma. Nevertheless, I think her steering made it impossible for the

Yuma to break her sheering in time to avoid disaster. This view is strengthened by the position of the Martin after she was sunk. Considering the character of her cargo, and the depth to which she was laden, as well as the force of the impact, I incline to the opinion that her bow went to the bottom without being carried an appreciable distance to the eastward. Her stern was carried to the westward. Had she immediately followed the Grover's starboarding to eastward, she would have been in her course, and undoubtedly the Yuma would have recovered from her sheer, the Martin passing unharmed. As the collision is, therefore, owing to the concurrent negligence of the Yuma and Martin, both are condemned. The proofs do not justify holding the Grover in fault. She seasonably starboarded abreast the Fontana wreck, and went to the eastward of the range line. No fault is attributable to her for the failure of her tow to follow in her course. The Martin could have avoided contributing to the collision independently of the Grover.

It follows that a decree must be entered for a division of the damages and costs, and a reference to compute the amount.