## THE TEASER.

## THE TRANSFER NO. 14.

### (District Court, S. D. New York. October 22, 1902.)

1. COLLISION—VESSELS MEETING—INATTENTION TO LIGHTS AND SIGNALS.

   A tug with a car float on each side passing up East river in the channel between New York & Blackwells Island, in the early morning, held in fault for a collision with a barge coming down in tow of a tug on a hawser, which occurred on the New York side of the channel, on the ground that she was on the wrong side of the channel, and was negligent in failing to give proper attention to the lights and signals of the approaching vessels, or to promptly and decisively change her course to starboard as soon as they were seen coming almost directly head on.

2. SAME—TUG WITH TOW—EXCESSIVE SPEED.

   The tug having the barge in tow also *held* in fault because she did not at once stop or at least reduce her speed when she found that the approaching vessel did not answer her signals, and apparently paid no attention to them.

3. SAME—INCREASED CARE REQUIRED OF TUG TOWING WITH HAWSER.

   A vessel which incapacitates herself by her method of towing from performing an ordinary statutory duty to avoid collision must show that she has exercised an amount of care commensurate with the increased risk; and the fact that she has her tow on a hawser while going with the tide does not privilege her to continue with unabated speed in the face of an impending collision, but to be exonerated from fault she must at least have stopped her engines and reduced her headway to that given her by the tide.

4. SAME—BARGE IN TOW—ERROR IN EXTREMIS.

   A barge in tow which has followed her tug up to the time she is placed in extremis through the fault of such tug and a meeting vessel cannot be charged with fault for a collision because of a slight variation of her course thereafter.

In Admiralty. Suits for collision.

James J. Macklin, for libellant.

Wing, Putnam & Burlingham, for the Teaser.

Henry W. Taft (Henry Galbraith Ward, advocate), for Transfer No. 14.

ADAMS, District Judge. This is an action brought by the owner of the barge David Wallace to recover damages caused to the barge by a collision in the East River, with a car float in tow on the starboard side of the steamtug Transfer No. 14, on the 25th day of March, 1901. The barge was in tow on a hawser, of about 45 or 50 fathoms in length, of the steamtug Teaser, and bound from Newport, Rhode Island, to Hoboken, New Jersey, through the channel between Blackwells Island and New York. The Transfer No. 14, with a float on each side, was proceeding through the channel from Jersey City to Harlem. The collision happened about 5 o'clock in the morning. It was before dawn, while the vessels' lights were burning and the navigation governed thereby. The tide was ebb and the weather clear.

The barge alleges that the Teaser, the barge following, was proceeding through about the center of the channel, and upon seeing No. 14

¶ 1. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

and floats ahead, blew the tug three signals of one whistle each, to which the Teaser and barge conformed, but that no heed was paid to the signals by No. 14 and she came on causing the collision. Fault is charged against the Teaser for not slowing, stopping and sounding alarm whistles when the first signal to No. 14 was not answered. Fault is charged against No. 14 in not keeping a proper lookout; in proceeding at too high rate of speed; in not stopping and backing in time; in not answering the signals of the Teaser and in not giving any alarm whistles.

The Teaser alleges that the lights of No. 14 were seen about a mile away and the tugs were then proceeding about head and head; that she blew a signal of one whistle and ported her helm, to which No. 14 made no reply; that she repeated this signal twice and gave a signal of four short blasts and a long blast, which signals she repeated, to none of which did No. 14 make any reply, nor did No. 14 check her headway but came on first striking the Teaser with her port car float and then the barge with the same; that the place of collision was very near the New York shore. The Teaser adopts the charges of fault against No. 14 alleged by the barge.

Transfer No. 14 alleges that she was pursuing a course about 300 feet off the New York shore and when she reached a point off 61st Street, the Teaser's side lights and the lights of the barge were seen; that the Teaser gave a signal which was so faint that the master of No. 14 was unable to make out whether it was a signal of one or two whistles and he immediately blew a signal of one whistle to indicate his intention to pass the Teaser to port; that the Teaser did not reply to No. 14's signal but kept on without changing her course, and the barge instead of following her, sheered to port across the course of No. 14; that the Teaser passed down the river on the port side of No. 14 while the barge sheered across No. 14's bows and came in collision with the starboard bow of the float and then under the influence of the sheer continued across the river and went ashore on Blackwells Island. The No. 14 charges fault against the Teaser in that she did not keep to the starboard side of the channel pursuant to the provisions of Article 25, did not have a proper lookout, did not have her side lights brightly burning, did not stop and back in time to avoid collision, did not blow the alarm whistles nor other signals in time and did not keep her tow clear of No. 14. No. 14 also charges fault against the barge in that she failed to follow the Teaser but sheered out of her course, bringing about the collision.

There is no material conflict in the testimony as to the tugs having been substantially in a head and head position to each other for some time as they approached and it was the duty of each to port her helm and pass the other on the port side. The distance between Blackwells Island and the New York shore varies from 750 to 900 feet, and allowing a reasonable margin for navigation away from the shores there is an average navigable channel in the vicinity of the collision, somewhere in the neighborhood of 61st Street, of about 600 feet. Of this space, No. 14, with her floats, occupied about 100 feet. The Teaser was about 25 feet wide and the barge about 36 feet wide. The ascertainment of the part of the channel in which the collision

took place is determinative of the question whether the tugs performed their respective duties to keep to the right. The witnesses for the Teaser testify that on seeing No. 14, she ported her helm and went within about 150 feet of the New York shore and that when the vessels were in close proximity, she ported again to avoid immediate collision and succeeded in escaping serious damage to herself though the port float struck her on her port side about 30 feet from the bow, with the effect of throwing her bow still further toward the shore, and then No. 14 and tow went on and struck the barge. The witnesses for No. 14 testify that when in the neighborhood of 59th or 60th Street she was proceeding about 300 feet off the shore, 100 feet nearer New York than the Island shore, and that the Teaser was in about the same position with respect to the shores. According to this testimony No. 14 was on the New York side of the channel, and I find that she was nearer the shore than she admits. She places the collision between 60th and 61st Street and only claims in her testimony to have seen the Teaser, off about 70th Street, when No. 14 was off 59th or 60th Street. In her answer she claims she was off 61st Street at the time. As the Teaser was going at least six miles an hour and No. 14 five miles an hour, they were, according to such locations, within about two minutes of collision when the Teaser and tow were first seen. The master, who was navigating No. 14, testifies that at this time he ordered the engine slowed and that he ported a half a point. I think the testimony justifies the conclusion that No. 14 was navigating so near the New York shore that, considering the space she and her tow were occupying in the channel, a collision was imminent unless she changed her course promptly and decidedly to the starboard when the Teaser and tow were some distance away. This she did not do. In fact the Teaser and barge were not seen until they were in close proximity. An attempt is made to account for the failure to see them sooner by alleging that the Teaser's lights were not burning brightly but the testimony to such effect is not of any value. The lights were burning properly and the fact that they were not seen sooner is also condemnatory of No. 14.

No. 14 was primarily in fault for the collision but a serious question remains whether the Teaser was not also in fault. She fulfilled her duty with respect to seeing No. 14 in time, in porting, in going to the right of the channel, and as to her lights and signals, but no claim is made on her part that she did anything to reduce her headway until in the immediate vicinity of No. 14, when she stopped and backed. It appears that she was going under one bell, which gave her the speed of about six miles an hour mentioned. Probably two miles of the speed was owing to the effect of the favorable tide, so that she was going through the water at the rate of about four miles. Her claim is that she could not stop and back sooner because the barge would have shot into her and there would have been danger of fouling the hawser in her propeller but it does not satisfactorily appear that she could not have, at least, considerably reduced her speed without subjecting herself to either danger and thus given No. 14 more time to perform her duty. Those navigating her saw that No. 14

was apparently paying no attention to her whistles but was, as they state, yawing back and forth, changing her lights to the Teaser, though not her general direction towards the Teaser, from which they concluded that the man at the wheel of No. 14 must be asleep. Under such circumstances, it is ordinarily the duty of a vessel to stop and back (The Columbia (C. C.) 25 Fed. 844, 23 Blatchf. 268), and I can not find that the Teaser has exculpated herself from fault because she had a tow on a hawser. When 'a vessel incapacitates herself from performing an ordinary statutory duty by such a method of towing, she must show that she has exhibited an amount of care commensurate with the increased risk which she assumes. The H. M. Whitney, 30 C. C. A. 343, 86 Fed. 697, 700. The Galatea, 92 U. S. 439, 23 L. Ed. 727, has been cited in support of the Teaser's contention that she was not required to stop under the circumstances. That was a case of collision near Hell Gate between a steam vessel going against the tide and barges in tow of a steam tug on a hawser going with the tide. There the steam vessels understood from the beginning what each intended to do and the fault was found to be with the vessel which failed to act in conformity with her duty to go to the right. Incidentally to that conclusion, it was said that if it were the duty of either vessel to stop, it was incumbent upon the vessel held in fault because she had the advantage of the opposing tide, whereas the other vessel could not stop in the favoring tide, meaning of course that she could not stop the headway resulting from the effect of the tide. It was explicitly said that the vessel might have stopped her engine, but it was held that such stoppage would not have prevented the collision. Obviously the evidence in that case was sufficient to satisfy the court that no harm resulted from the failure to stop the engine and I do not regard the decision an authority for the exoneration of a towing tug which continues with unabated speed into an impending collision, in the absence of convincing testimony that the failure to stop her engine or reduce her speed could have had no effect in avoiding it. The decision in The Galatea is with respect to the right of way as between an ascending and a descending vessel (The Dasori (D. C.) 47 Fed. 330, 331), but does not hold that there is a right of way on the part of a descending vessel which will result in bringing her tow into a collision with an ascending vessel. The Teaser must also be held.

If it be assumed, as claimed by the barge, that she was following the Teaser until the latter sheered towards New York, it would seem that the barge must have then sheered to the port across the bow of No. 14's starboard float because otherwise the collision between the starboard stem of the barge and the starboard corner of the float, which the testimony establishes, could not have taken place. It is not satisfactorily shown what the cause of such sheer was. The witnesses on the barge state that she attempted to follow the tug to the starboard when the tug changed in that direction in the immediate vicinity of No. 14 but that she could not steer so quickly as the tug and had not time to turn much, if any. It is suggested that the hard-a-porting of the tug threw her stern and her end of the hawser to the port, giving the barge a pull in that direction, which may ac-

count for the sheer. In any event, it being satisfactorily shown that up to that time the barge had followed the tug with reasonable accuracy, it would not be just to hold her for a slight change in the wrong direction when in extremis through the faults of other vessels.

Decree for libellant against both tugs, with an order of reference.