THE H. B. RAWSON.

THE PRINZ ADALBERT.

(District Court, S. D. New York.   March 26, 1907.)

COLLISION—STEAMER AND MEETING TOW—ABSENCE OF PROPER LOOKOUT.

A steamer coming in from the sea to her dock at Hoboken *held* in fault for a collision with the second of two meeting scows in tow on a hawser in the lower Hudson in the evening, on the ground that she had no lookout properly stationed in front to make reports of the tow, in consequence of which she was navigated by the pilot without knowledge of the tug's movements, and did not heed or answer the tug's signals, and also because she did not sooner stop and reverse. The tug exonerated, although she might have stopped sooner, on the ground that the fault of the steamer was sufficient to account for the collision, and her contributory fault was not clear. There being but one light on each of the scows *held* unimportant in view of the steamer's fault and the fact that the tug carried proper towing lights.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 120, 142, 172.]

In Admiralty.   Suit for collision.

Carpenter, Park & Symmers, for libelant.

Wing, Putnam & Burlingham, for the Rawson.

Wheeler, Cortis & Haight and John W. Griffin, for the Prinz Adalbert.

ADAMS, District Judge.   This was a cause of collision happening in the North River in the vicinity of the Battery about 7 o'clock P. M. on the 5th day of September, 1905, between the Steamship Prinz Adalbert, bound from sea to her pier at Hoboken, and the Scow Orleans, belonging to the Bouker Contracting Company, being towed on a hawser, in company with another scow, No. 32, just ahead of her, by the Tug H. B. Rawson, from the foot of Canal Street, New York City, to Barren Island. The tide was ebb and the weather clear. The steamer struck the scow on the bow near her port side, cutting into her and causing her to career and dump part of her cargo.

The libel alleges that the lights of the tow were burning brightly and when it reached a point a little below the New Jersey Central Railroad Ferry on the New Jersey side of the river, a steamer was encountered, which subsequently proved to be the Prinz Adalbert, coming up the bay about half a mile distant, showing her green light; that a signal of two blasts was given by the tug to the steamer but no answer was made thereto by the steamer and shortly afterwards she changed her course shutting in her green and showing her red light, whereupon the tug blew to her a signal of one blast and ported her helm; that the steamer gave no answer to this signal, whereupon the tug blew alarm whistles and again gave a signal of one blast to the steamer; that the steamer paid no attention to these signals and kept on, passing close to the tug on the latter's port side, and notwithstanding alarm signals and shouts from the tug the collision happened as stated above. It is charged that the steamer was in fault in not navigating on the easterly side of the channel; in not answering or

heeding the signals of the tug; and in not slackening her speed or stopping and reversing in time to avoid the collision. It is also charged that the tug was in fault in that receiving no answer to her signal she did not slacken her speed or stop and reverse, and in not sufficiently changing her course to the starboard after blowing her signal of one whistle.

The answer of the steamer alleged that she arrived in port on the day in question and, after stopping at' Quarantine, proceeded up the bay and river towards her dock in Hoboken against the tide at slow speed and after passing Bedloe's Island, a tug was sighted about half a mile away showing her red light and heading down the river; that signals of one whistle were exchanged between the vessels and the steamer's helm was ported and her engines reversed until she was dead in the water; that the tug kept her speed and headed the tow across the bow of the steamer in such a way that the tide swept the tow against the steamer; that the first of the barges carried one faint light aft which did not show ahead; that the second barge carried no light. It is charged that the tug was in fault in not porting her helm or porting it sufficiently upon exchanging signals of one whistle with the steamer; in not slackening her speed or stopping and reversing in time; that her speed was excessive; that she did not give the steamer a wider berth; that she had not sufficient power to control her tow; that she headed her tow across the steamer's bow and allowed it to drift down upon her. As to the tow, it is charged, among other things, that it did not show proper lights.

The tug alleged that the collision was due to the fault and negligence of the steamer in not keeping to the starboard side of the channel; in proceeding at too great a rate of speed; in not having a competent master; in not having a competent lookout; in not giving the tug and tow a wider berth; in not answering the tug's signals and in giving no signals whatsoever; in not stopping or doing anything to avoid collision.

A great deal of the testimony was given to establish the respective contentions of the parties with regard to the place in the channel the vessels were navigating in under the narrow channel rule (article 25, [U. S. Comp. St. 1901, p. 2870]), but that has become unimportant in view of the recent decision of the circuit court of appeals in the case of The Islander and The Philadelphia, not yet reported, where it was held that so much of the North River as extends from 23rd street to the Upper Bay is not subject to the rule. This collision happened not very far from the center of the river and depends for its solution upon the care given by the respective vessels involved to their own and the other's movements.

The principal contention against the steamer is that she had no lookout. It appears that there was no one attending to that duty forward. It is claimed that there was one in the crow's nest on the foremast, about 75 feet from the stem and 35 feet above the deck. This man was not produced but there is testimony from the third officer, who was stationed on the bridge, that he reported the red light of the tug but no lights on the scows. The pilot, however, who was in charge

of the navigation said, in a general way, that the lookout was stationed on the forecastle head but does not claim to have received any reports from him there or from the crow's nest. In fact there was no lookout forward and it is to be considered whether that caused or contributed to the collision. It is urged by the steamer that if there had been any number of lookouts, the result would have been the same and the absence of one, if it be determined that there was none, is immaterial. The pilot said on cross-examination that he would not have been aided by reports from a lookout, using this language:

"Q. You don't, when you are navigating great ships 200 feet from the bows of the ship, you don't undertake to do the duties of pilot and lookout at the same time? A. I have to do it because you are up higher than they are and you have your glasses and facilities to look out, and that is all you have to do; there are so many vessels and scows going across each way it would annoy you if they sang out every time they saw a light."

The pilot did not see any lights on the tug or tow but the three towing lights. Others on the bridge of the steamer, however, saw the tug's red light when they first observed her but said nothing to the pilot about it and he navigated the ship on the supposition that a vessel was approaching him bound in an opposite direction. He said he intended to go to the westward of such vessel and pass her starboard to starboard. This necessitated crossing the bow of a vessel on his starboard hand. It can not be supposed that if he knew of the red light, such a dangerous manœuvre would have been attempted and it would have been the duty of a lookout to report the light so the report could have been heard by the pilot on the bridge. The pilot said he knew a vessel was above him in the river bound down but evidently was not aware of her movements. I think the steamer was clearly in fault in this respect, as well as for not stopping and reversing in time. She did operate her engines to achieve that purpose but she did not succeed in overcoming her forward motion and the collision resulted.

The tug master's account of the collision was that the tow was about abreast of the New Jersey Central Ferry when he first saw the steamer, showing a green light ahead, and he blew a signal of two whistles; that he thought the steamer at that time should have seen his green light; that he received no answer to his signal and when the vessels had covered half the distance between them, the steamer showed her red light, also right ahead, and he blew a signal of one long whistle to which he received no answer and then blew an alarm signal, then blew another long single blast; that at this time the vessels were within 700 or 800 feet of each other and he ported his wheel and tried to pull away from the steamer, changing his heading about 4 points; that each scow had a light on a pole on her stern forward of the cabin, the stern scow, the Orleans, having a light in the same position, towards the stern but none forward; that the steamer passed the tug about 200 feet away, grazed along the port side of No. 32, then struck the Orleans on the port side of her bow and caused the damage. This account is corroborated in a general way by other witnesses from the tug, and I think may be regarded as true.

With respect to the steamer's charges of fault, mentioned above,

those regarding the speed of the tug are of no importance. She was probably not going more than 2 knots faster than the current, so that her total speed over the ground did not exceed about 4 knots and no fault can be found with her in that respect, and having her tow on a hawser, she could not reverse. She could, however, have stopped sooner, and in view of the absence of signals on the steamer's part, such a course would have been more prudent and perhaps effective in avoiding the collision, but the case is similar in principle to The Teaser (D. C.) 118 Fed. 81, where a tug towing a vessel on a hawser failed to keep her tow out of collision by stopping, was held in half damages in this court because she failed to stop in time, but such finding was reversed on appeal (127 Fed. 305, 62 C. C. A. 223), because the primary fault being attributable to the other vessel, there was not such clear proof of contributory negligence as would justify an apportionment of the damages. I think such is the case here and the tug should not be held.

'The tow is also charged with fault in not maintaining proper lights. It is contended that each scow should have had two instead of one. The steamer knew by the towing lights she saw on the tug that there was a tow several hundred feet astern. It does not seem to have made any difference that there was but one light on each scow instead of two.

The libel against the tug will be dismissed. There will be a decree for the libelant against the steamer, with an order of reference.