## THE LUTHER C. WARD.

### THE GEORGE S. TICE.

(District Court, E. D. New York. December 13, 1906.)

1. COLLISION—TOWS MEETING—AGREEMENT FOR PASSING.
   Where tugs navigating with tows in the vicinity of New York and accustomed to passing in adverse situations agree upon the manner of passing when a sufficient distance apart to give them freedom of choice they should be concluded thereby from afterward claiming that the manner agreed upon was improper.

2. SAME—TOW AND DREDGE.
   A tug with a tow which agreed with a meeting tug to pass starboard to starboard in Arthur Kills when the two tows were 1,000 feet or more apart, and which failed to starboard her helm promptly, but afterward attempted to pass to the left of a dredge at work in the channel, *held* solely in fault for a collision between one of her tows and the dredge; it appearing that there was sufficient room for her to pass to the left of the dredge.

In Admiralty. Suit for collision.

Carpenter, Park & Symmers, for libelant James K. Symmers, advocate.

Wilcox & Green, for The Luther C. Ward.

Howard S. Harrington, for The George S. Tice.

THOMAS, District Judge. At about 9 a. m., in clear weather, and with the tide flooding eastward, Dredge No. 2 was working in the Arthur Kills. She was about 36 feet wide, and 96 feet long, and had on her port or south side a scow 35 or 40 feet wide. Some 150 or 200 feet easterly, and some 25 feet northerly was Dredge No. 7. Making due allowance for the width of the dredge and scow, and the shoal water on each shore, there was about 230 feet of navigable water on the south or Staten Island side of the dredge, and about 150 feet of such water on the north or New Jersey side of the dredge.

The Tice, with three loaded barges tandem, passed Dredge No. 7, and while in the vicinity of such dredge was herself passed by the Overbrook and a tow, which passed Dredge No. 2 on the Staten Island side, and met and passed to the port of the tug Ward, who had four light barges, of which three were in the hawser tier, and one tailed on behind, making a flotilla about 100 feet wide and some 600 feet long. This meeting was shortly after the Ward had pulled through the Baltimore & Ohio bridge, which was about 2,500 feet from the dredge. When the Ward was about half way between the bridge and the dredge, or at least 1,000 feet from the dredge, she received two whistles from the Tice, and promptly answered with two whistles. The Ward did not starboard immediately, but went quite a distance before doing so, which she attributes to the Pennsylvania tow being in her way on her port hand. But she did finally starboard, and passed between the dredge and the New Jersey shore, herself clearing the dredge by some 50 feet, but some portion of the Ward's tow hit the dredge, doing injury for which the libel is filed against the Ward, who has by petition brought in the Tice, against whom she alleges that the Tice, instead of going on the New Jersey side of the dredge, took the water on the dredge's port or Staten Island side, leaving no sufficient room for the Ward to pass, and forced her to go to the northward of the dredge. The captain of the Ward testified that when he got signals from the Tice she was under the digger's stern. The claim of the Tice is that she was close to the Staten Island shore when she gave the signals, and the evidence of the inspector on the dredge is that the Tice cleared the dredge by 150 feet, while the captain of the dredge makes the distance 200 feet. The captain of the Ward claims that the Tice should not have gone to port, but should have gone north to the dredge, and that even when she did go towards the Staten Island shore, she did not go far enough to give the Ward room to pass south of the dredge.

As to the first claim, it is sufficient that the vessels themselves settled the manner of passing each other, and, considering the distance between them, the Ward did not act under duress. If the Ward regarded the maneuver as faulty, her captain should have blown alarm whistles and stopped the proposed passing, compelling the Tice to go about, or otherwise dispose herself. The proposition that the Ward was acting under menace, if true, emphasizes the necessity for alarm whistles. It was not an easy place to pass, but such tows are accustomed to passing in adverse situations. At the moment they are the best judges of the advantages and perils, and as between themselves, in a case like the present, their agreement should exclude excuses. There was room enough for either tow to pass north of the dredge, and the event shows that if the Ward had acted more promptly, she would have cleared the dredge. Her captain hesitated. He testified that he pulled to the north "as soon as I saw how things were going." If, after exchanging signals, he waited to see how things were going, he waited too long to make a safe passage on the north side of the dredge. Such delay was negligent as to the dredge. The distance the Tice pulled to the southward of the dredge is inconsistent with the Ward's position that the Tice was leaving too little room on

the south side. Had the Ward attempted to pass to the southward of the dredge, it is presumable that the Tice would have given her more room. But when the Tice saw the Ward pull to the northward, with the obvious purpose of going between the dredge and the New Jersey shore, there was no occasion for the Tice to pursue her way farther to the southward.

It is considered that the decree should be entered against the Ward alone, and the petition bringing in the Tice dismissed.