## THE WERDENFELS.

## THE TRANSFER NO. 11.

(District Court, S. D. New York. February 1, 1907.)

1. COLLISION—SUIT FOR DAMAGES—ISSUES—DECREE.

In a suit for collision, the grounds of fault relied on should be covered by the pleadings, and cannot be put forward for the first time in argument after the case has been tried and closed on other issues.

2. SAME—STEAM VESSELS MEETING—FAILURE TO CARRY OUT PASSING AGREEMENT.

A collision in the daytime in Hell Gate, near Hallets Point, between an ocean steamer bound for New York and a car float in tow on the side of a tug bound for Oak Point, *held*, on conflicting testimony, due solely to the fault of the tug in failing to carry out an agreement to pass to the right made when the vessels were a quarter of a mile apart.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 16, 10, 39.]

In Admiralty. Cross-suits for collision.

William Greenough, for New York, N. H. & H. R. Co.

James J. Macklin, for cargo in cars and advocate for New York, N. H. & H. R. Co.

Wing, Putnam & Burlingham, for the Hansa Line.

ADAMS, District Judge. This action arose out of a collision which occurred about 3 o'clock P. M. on the 18th day of April, 1906, in Hell Gate, between Hallets Point and Negro Point, Wards Island, between the German steamship Werdenfels, bound from Boston to New York, and the New Haven Railroad Company's car float No. 52 in tow on the port side of the tug Transfer No. 11, bound from Communipaw to Oak Point. The steamer was 375 feet long. The tug had a car float on each side, No. 51 being on the starboard side. Each float was about 300 feet long and projected about 150 feet ahead of the tug. The tide was flood and of about 5 knots in strength. The weather was clear. A pilot had brought the steamer to City Island and there an East River pilot, who had been taken aboard at Boston, took charge of the vessel. The tug was in charge of a regularly qualified master. Each vessel saw the other in time and duly exchanged signals to go to the right.

The New York, New Haven & Hartford's claim is for about $40,000, and is set forth in its libel as follows:

"Third. That on or about the eighteenth day of April, 1906, the steamtug 'Transfer No. 11' left the terminal of the Central Railroad of New Jersey, at Communipaw, at 1.50 P. M., with car float No. 52 in tow on her port side and car float No. 51 in tow on her starboard side, bound for Oak Point; that when the Transfer and her tow arrived at a point in the East River, off and slightly to the west of Hallett's Point, she blew a long blast of her whistle as warning signal to warn vessels rounding said Point or rounding Negro Point on Ward's Island of her approach, and after passing Hallett's Point, a vessel, which afterwards proved to be the German steamship 'Werdenfels', was seen bound west, near the Ward's Island shore, and to the eastward of Negro Point. 'Transfer No. 11' slowed down and the steamship blew a signal of one whistle which the Transfer answered with one whistle at once and put her wheel to port and went ahead and hooked up. When the steamship came

out from behind Negro Point, not having taken proper precaution, the flood tide, setting from the Point towards the Long Island shore, struck her in such a manner that she failed to comply with her signal of one whistle, but instead sheered over towards the Transfer and her tow; that without slackening her speed after she began to sheer, the steamship blew an alarm whistle which the Transfer answered and kept on at full speed, as it was impracticable for her to stop or back in the swift tideway at the point in question. The steamship then blew a signal of one whistle which the Transfer answered with one whistle, and kept her wheel to port, but the steamship failed to comply with her signal and alter her course to starboard, instead of which she continued to sheer towards the Transfer and her tows, in such a manner as to make collision imminent. When the bow of the steamship had passed abreast of the bow of the port float, the Transfer's wheel was put hard to starboard and the Transfer's engines set full speed ahead, in order to swing, if possible, the stern of the floats away from the bow of the steamship, but owing to the speed at which the steamship was proceeding, she came into collision with the port side of the port float, about amidships thereof, damaging the float seriously and breaking it loose from its fastenings to the said Transfer, as well as the float on the starboard side of the Transfer, and pushing five of the freight cars upon said port float overboard into the river, where the same became submerged, and leaving two more of said cars hanging over the bow of the float. That as a result of said collision the cargo of said cars was very seriously damaged and may become a total loss. That the collision happened at 2.55 P. M. The tide at the time was strong flood, the weather clear and the wind light."

The owner of the steamer's claim is for $5,000 and is set forth in its libel as follows:

"Second. On April 18th, 1906, the Werdenfels partly laden with a general East India cargo and in passage from Boston to New York, passed City Island, bound through Hell Gate, at about two o'clock P. M. The day was clear, with little or no wind, and the tide was running strong flood.

The vessel was in charge of a Hell Gate pilot, who was on the bridge with the master and second officer, and an experienced able seaman at the wheel. The chief officer was forward on the forecastle head, and a sharp lookout was kept.

As the steamship passed the dock at Ward's Island she began blowing a long bend signal and continued it for fully a minute. As she approached Negro Point she sighted, off Hallett's Point, but well over towards Flood Rock and more than half way across the Gate, a tug which proved to be Transfer No. 11, bound east with two loaded carfloats in tow, one on each side, 52 being the starboard float and 53 the port float.

As soon as the steamship sighted the tug, she gave her a signal of one blast, and ported her wheel. The tug made no reply, and the steamship's engines were at once slowed down and a second signal of one blast was given, which the tug answered with one.

If the Transfer No. 11 had ported her wheel and kept over towards the Long Island shore, as she could easily have done, there would have been no possibility of collision; but apparently she made no effort to keep over, and the Werdenfels gave her another signal of one blast, put her engines full speed astern, and blew three blasts.

Although the steamship was under reversed engines for two minutes, and her way was almost off, the tug swung her port float directly into the steamship's bow, indenting several plates on each bow, bending frames and reverse frames, starting and breaking rivets and doing other serious damage to the steamship.

Float No. 52 was also damaged and several of the cars loaded thereon ran off the tracks."

The allegations in the pleadings cover numerous charges of fault but it is not necessary to consider any save such as relate to the failure of

one of the vessels to perform her part of the agreement to pass to the right, which was the direct cause of the collision.

A contention on the part of the tug that the steamer should have availed itself of the opposing tide to stop her headway while the tug was passing and thus keep out of the way, has been urged with much force by the advocate for the tug, with a considerable citation of authorities. Such fault, however, if it existed, was not pleaded and the litigation not conducted with a view to the determination of such a question. It is argued by one side only and it does not seem proper to enter upon a discussion of it under the circumstances. If, in view of the condition of the tide, the tug had a right of way, over the steamer as now claimed, it should have formed a part of her case in the pleadings and not left to be put forward until after the case was closed.

The same may be said of the further contention with respect to the starboard hand rule. There was no fault charged against the steamer in such respect.

The faults charged in the Railroad Company's libel are:

"1. In proceeding at a high and unjustifiable rate of speed.

2. In not keeping a proper lookout.

3. In not conforming with her signal of one whistle and proceeding towards the starboard side of the channel and passing the Transfer and her floats port to port.

4. In not slowing, stopping and backing before the collision and in time to avoid the same.

5. In failing to anticipate the effect of the flood tide sweeping from Negro Point towards the Long Island shore, or to counteract the same.

6. In not taking timely steps to avoid the collision.

7. In that her master and crew were incompetent and not attending to their respective duties.

8. And in such other particulars as the libelant will show upon the trial of this action."

These charges do not specifically present the present claims. The case has been litigated upon the question of conformity to the agreed method of passing, that is port to port. The master of the tug testified:

"Q. What did you slow down for? A. To see what he wanted to do, he kept coming as a usual thing with a big vessel like that, they lay in around Negro Point to let those going up pass first.

Q. That is usual is it? A. That is usual, yes, sir.

Q. Could you have indicated to her in any way you would like to have her do that? A. I preferred to allow him to handle the whistles himself and go according to his whistles if it is a possible thing, as he had the bigger vessel.

Q. Was it the whistle of the steamship that first called your attention to her? A. No.

Q. You saw her before she blew? A. Yes, sir.

Q. Why didn't you blow to her? A. I was waiting to get a signal from him to find out what he wanted to do.

Q. If you thought two whistles would be the right signal, why didn't you blow it? A. Because I was leaving it to him, giving him the preference.

Q. What was that, courtesy on your part? A. In a way, we generally rather have a ship blow at us than to blow at the ship first.

Q. You just said you think it is usual and customary for vessels bound west to give the right of way to the vessels bound east on the flood tide, haven't you? A. Yes, sir.

Q. And you thought at that time that you had really the right of way, didn't you? A. I did, yes.

Q. Why didn't you claim it? A. Inasmuch as I was going up with the tide.

Q. Why didn't you claim it? A. I tried to explain that to you, my friend.

Q. I may be dull. Explain it again. A. I told you on account of her being a ship I waited to get a signal from him first, which I did, and when he gave me a signal I answered and went accordingly.

Q. What was it made you wait, because she was a ship? A. And being a bigger vessel, yes, a ship.

\* \* \* \* \* \* \* \* \* \*

Q. There was nothing in Hell Gate to bother either of you in the way of craft, was there? A. No, nothing there.

Q. And in broad daylight, two vessels were here that understood each other? A. Yes, sir.

Q. And exchanged signals of one whistle? A. Yes, sir.

Q. You say that within 10 seconds of the time that the Werdenfels blew one whistle to you, you thought there was danger of collision? A. I did, yes.

Q. And you were then going hooked up? A. Yes, sir.

Q. And you never stopped? A. And we never stopped.

Q. And you didn't blow alarm whistles until after the other boat had? A. I did not.

Q. You did nothing to avoid collision, did you? A. I did all I could.

Q. You did what? A. I went ahead under an extra jingle with wheel hard a starboard to swing away from the ship."

According to the tug's testimony she was 112 feet long and had the car floats in tow as stated. They were three track steel floats and each loaded with 22 cars. When the East River was reached from Communipaw, it was about the second hour of the flood tide and the tow, passing through the channel between Blackwells Island and Manhattan, reached the vicinity of Hallets Point about 2.52 or 2.53 and the strength of the flood tide which was running 5 or 5½ miles per hour. Before reaching Hallets Point a long blast of the whistle was sounded, a bend whistle, but no answer was received to it. A lookout was duly stationed on top of a car on the port float about 80 or 90 feet ahead of the pilot house and the pilot and the lookout were calling to each other about the steamer's approach. At Hallets Point the set of the tide was towards Hogs Back on the Wards Island shore, and from there right by Negro Point, on Wards Island, to Steep Rocks (designated on the chart as Scaly Rocks) on the Long Island shore. When finishing the long blast, the tow was about abreast of Hallets Point Light, and it was said a tow of this kind usually goes along there near the center of the channel to avoid the Steep Rocks which is a familiar place for vessels to go ashore. When the Werdenfels was first seen the tow was still rounding Hallets Point under a port helm and saw the steamer on her starboard hand. The steamer was then close to the Wards Island shore, about 600 feet to the eastward of Negro Point, and heading directly for the Long Island shore and the tow directly for Wards Island. The tug did not sound any signal at this time but waited for the steamer to indicate a desired course, which she did by sounding one blast which the tug answered with one. At this time, the tow had rounded Hallets Point and was heading towards the Long Island shore at the lower end of Steep Rocks. They had proceeded about 400 feet towards Negro Point on the line first indicated and the steamer had reached a point off Negro Point. Upon the exchange

of whistles the tug ported her wheel and swung more to the Long Island shore. At this time, she was going 7 or 8 miles an hour by the land, which speed she had been going under for 3 or 4 minutes. The pilot of the tug says the steamer kept swinging over towards the float all the time and that if he had not known of the set of the tide, he would have thought that the steamer had starboarded her wheel, she sheered so much to the left. The pilot of the tug further says that after the exchange of whistles, the steamer blew an alarm, which he answered with several short blasts of his whistle and an alarm. The pilot further says that at that time, his port float was on the steamer's port bow and when they were 300 or 400 feet apart and each had blown alarm whistles, the steamer was coming almost head on to the port side of the port float, which was partly on the port and partly on the starboard of the steamer and when they were not more than 200 feet apart, he rang an extra jingle for full speed and put his wheel to starboard to swing the stern of his float away from the bow of the steamer, the only thing left for him to do; that the steamer up to the time of the collision was heading across from Negro Point; that she kept swinging to the left and struck the float about amidships, cutting into it about 20 feet fore and aft and about 5 feet athwartships; that the collision happened right on a line between Negro Point and the Steel Dock. The pilot said about 250 feet from the upper end of the dock but he indicates on a chart a point a distance of about 400 feet and that if he had gone any closer to the shore, he could not have recovered and cleared Scaly Rocks.

According to the testimony of the Hell Gate pilot in charge of the steamer, he was directing the navigation from the bridge, about 150 feet from the stem. He said that when they came down to Negro Point Bluff they were 150 feet from the shore; that they could not have been 50 as stated by some of the steamer's witnesses, because the steamer would then have gone on the beach; that it was the strength of the flood tide, 4 to 5 knots, and they were going about 5 knots by the land; that he blew a bend whistle, a continuous one of about 15 seconds, before they reached the bluff on Wards Island, but did not hear any signals from a vessel coming the other way; that he saw the Transfer and floats over Negro Point, about 1½ points on the starboard hand, well over towards Mill Rock, heading well between Hogs Back and the Harlem River; immediately afterwards he saw her coming to starboard as if porting and gave her one blast, which she did not answer and the steamer made no change in her wheel; that she then blew again, about 15 seconds later, to which the tug responded with one blast; that the tow was then heading between Hogs Back and Negro Point; that he did not think there was any danger of collision, he expected the float to get out of his way and give him a chance; that he commenced to port right after coming by Negro Point Bluff and was never in the eddy off that point, which only comes out 50 feet between the lower deck and Negro Point, where there is a slight inward curve of the shore; that after he began to port the helm off the bluff, it was never afterwards put to starboard before the collision; that the vessels were about a quarter of a mile apart when the tug answered the one whistle; that the steamer was then swinging to the starboard and the

tow also. The witness indicated on the chart a point about ¼ of a mile to the eastward of Negro Point, as the place where he was when he first blew, and a point about 450 feet to the westward of that, as the place where the agreement for whistles was made, and placed the tow at the latter time about the middle of the channel off Hallets Point on a course towards Pot Rock, where the collision took place. The witness then said that he did not see any danger of collision until the vessels were within a couple of lengths of each other, when he saw that the tow was drifting across the steamer's bow and he slowed the steamer and gave orders for full speed astern after blowing danger signals; that the steamer at the time was heading for the outside of Hogs Back, off the eastern end of Mill Rock, to go around Hallets Point; that at the time of collision the tow was heading well into Pot Cove and it was nearer Wards Island than Long Island, to the northward and westward of the point marked Pot Rock on the chart; that the steamer anchored after drifting in the direction of Pot Cove about 300 feet; that there was no difficulty in powerful vessels like No. 11 in keeping over to the right, they can go close enough to Scaly Rocks to jump off, a vessel will not drift ashore there but will do so in the eddy above. The witness further said that the tidal current comes up out of the Narrows to the east of Blackwells Island close to the shore and comes close to Hallets Point, boils on that point and sweeps on across the cove to Scaly Rocks; that he made two lines on the chart, the first indicating the tide as it sets from Horns Hook and Hogs Back on Negro Point, the other indicating its sweep close to Hallets Point and along the shore towards the cove and then on to the Long Island shore. The witness further said that if the tug had blown alarm whistles he would have stopped the steamer immediately and anchored as a last resort. He said on cross examination that he never knew of any vessels striking Scaly Rocks on the flood tide, had heard of some touching there; that the Transfer was making two knots in excess of the tide, in all 6 or 7 knots. This witness said that he could not give the angle of collision but that the steamer angled aft.

Numerous witnesses have been examined, 25 in all, and there is great contradiction with respect to minor matters but it stands out plainly that the determination of the controversy turns upon the question whether the vessels carried out their agreement to go to the right, which they made with a full knowledge of the difficulties they might encounter in endeavoring to do so in this dangerous place.

The place of collision is not very much in dispute with respect to its general locality. The Transfer contends that it was off the Steel Dock, towards Negro Point, about 400 feet. The steamer contends that it was 400 feet further to the eastward, towards Negro Point, and about the same distance from the latter place. The channel there is about 1200 feet wide and if divided into thirds, the center one would be the debatable ground. The consideration of the position involves the question whether the steamer swung to port.

The angle of collision is a persuasive argument in favor of the steamer. All agree that they came together at an angle of about 45 degrees, the steamship angling aft on the float. The contention of the tug is that she was heading towards Pot Cove or east of it to some ex-

tent. The angle of collision on such assumption will˙ necessarily show the steamer to have been heading on her course towards Mill Rock and not towards the Steel Dock as contended for by the tug. This confirms the testimony on the part of the steamer that she kept her starboard course and did not go to the left side of the channel. The contention in this respect is also confirmed by two disinterested witnesses from the vicinity of Hallets Point, one of whom testified generally to the same effect, and the other produced a photograph made by himself shortly after the collision, showing the vessels still together and that the angle of collision is not in excess of 45 degrees. The pleadings show and it is stated in the testimony that in the extremity of the collision the tug starboarded to ease the blow. It does not appear that this made enough of a difference in the,heading of the tow to substantially change the angle of collision.

I think the determination must be in favor of the steamer's contention. That she was able to turn to the right, notwithstanding the tide on her starboard bow, seems more probable than the tug's claim that the steamer went across the channel to within a few hundred feet of the Steel Dock, and is supported by a preponderance of the evidence. The difficulty in the case probably was that the master of the tug failed to realize that he would be unable to do in the strong tide what he was undertaking and the course of the trial and the arguments would seem to indicate that in spite of the agreement, which required both vessels to keep to the right, the tug expected the steamer to do more in carrying it out than was to be looked for from the tug. The evidence satisfies me that while there was an effort on the part of both vessels to perform the agreement, that of the tug failed. The tug should in the beginning have indicated that she did not consider it safe to at· tempt to pass to the right and instituted another course or should have responded to the one whistle signal of the steamer by an alarm, indicating that the tug could not undertake the proposed manœuvre. Under such circumstances the steamer, according to the pilot's testimony, would have waited under Negro Point and done exactly what the tug now contends she should have done.

There will be a decree dismissing the libel of the tug and sustaining that of the steamer, with an order of reference.