THE EDNA V. CREW. THE BAKER PALMER. THE PORTSMOUTH. THE BARGE NO. 2.

(District Court, E. D. Virginia. October 20, 1910.)

COLLISION (§ 61*)—TUGS WITH TOWS MEETING—FAILURE TO COMPLY WITH PASSING AGREEMENT.

.As the ocean tug Portsmouth, with a car float in tow, was entering Hampton Roads on her way from Cape Charles to Norfolk, her tow came, into collision with a schooner in tow of the tug Crew coming out. To the northward of the Crew was another tow, and the Portsmouth gave the Crew a signal of two whistles, which was assented to, and took the south side of the channel, which was the usual and shorter course for vessels coming in from Cape Charles. When the tugs were opposite each other, the Portsmouth saw the steamer Juniata approaching and signaled her to pass port to port, and shortly after the collision occurred between the tows. After assenting to the Portsmouth's signal, the Crew changed her course to port but half a point until collision was imminent. *Held*, that the passing signal given ,by the Portsmouth was proper under the circumstances; that her subsequent navigation was without fault; that on accepting the signal it was the duty of the Crew to facilitate the safe passing by going to port, for which she had sufficient room; and that her failure to do so was the' fault which produced the collision and rendered her solely liable therefor.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*

With or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit for collision by The New York, Philadelphia & Norfolk Railroad Company, as owner of Barge No. 2, against the steam tug Edna V. Crew and schooner Baker Palmer, and cross-libel by Edward H. Smeed, master of the Palmer, against the steam tug Portsmouth and Barge No. 2. Decree against the Edna V. Crew.

Thomas H. Willcox and Floyd Hughes, for the railroad company. Hughes & Little, for the Edna V. Crew and the Baker Palmer.

WADDILL, District Judge. On the evening of June 21, 1909; about 8:30 o'clock, Barge No. 2, a car float of the New York, Philadelphia & Norfolk Railroad Company in tow of the railroad company's tug Portsmouth, en route from Cape Charles to Norfolk, Va., came into collision with the schooner Baker Palmer, then in tow of the tug Edna V. Crew, owned by Joseph M. Clark Company. The collision occurred in the waters of Chesapeake Bay, just outside of Hampton Roads, about three-quarters of a mile below the Ripraps, off Old Point Comfort, Va.

The tug Portsmouth was a seagoing' tug especially equipped for handling car floats between Norfolk and Cape Charles; 214 tons gross burden, 116 feet 3 inches long, 23 feet beam, 12 feet draft. The barge, constructed for the transfer of freight and other cars, was 822 tons gross burden, 325 feet long, 44 feet 6 inches beam, and about 8 feet draft, having on board at the time of the collision 27 empty and two loaded cars, and was being towed by the Portsmouth, on a hawser of about 100 fathoms in length. The Edna V. Crew was a seagoing

tug of about 109 tons burden, 98 feet long overall, 25 feet beam, 11 feet 6 inches draft, and having in tow the schooner Baker Palmer, which was 275 feet on the keel, 46 feet 6 inches beam, draft 26 feet 9 inches, loaded at the time of the collision with 4,249 tons of coal, and was being towed on a hawser of about 80 fathoms.

The faults assigned by the parties, respectively, as causing the accident, are many; the libelant and respondent respectively charging each other with errors in navigation and bad seamanship. The details of these several assignments of faults need not be recited or gone into, in the view taken by the court of the case, as those having special bearing on the collision will be stated and commented upon. The accident was a very unusual one, due largely to the number of craft then passing over the waters in question, the sinuosities of the channel between the mouth of the Elizabeth river and Thimble Light, and the course adopted by navigators in passing in and out of Hampton Roads into Chesapeake Bay, over that course. The Portsmouth and car float were going into Hampton Roads, having crossed the bay from Cape Charles outside of and to the southward of Thimble Light, and, proceeding some distance beyond the Light, she observed ahead the tug Crew towing the schooner Palmer, coming out of Hampton Roads to the Capes, as also the tug Dixie towing three bay barges, likewise proceeding out of Hampton Roads; the latter tug and tow navigating to the northward of the Crew and Palmer in the channel, about half the length of the latter tug and tow, which was 1,100 feet long, being ahead of the Crew. At this juncture, and when the tugs were from half to three-quarters of a mile apart, the Portsmouth sounded two whistles, indicating to the Crew that she would pass her to the southward, that is to say, starboard to starboard, which signal the Crew accepted and assented to, by sounding two whistles, indicating that she would pass on that course. The Portsmouth proceeded on this theory until about opposite the Crew, when she observed the approach of the steamship Juniata of the Merchants' & Miners' Transportation Company, going to sea, to which she gave a signal of one blast of her whistle, indicating that she would pass the ship port to port.

It is this alleged improper navigation of the Portsmouth in the particulars mentioned that the respondent and cross-libelant insist largely caused the accident; in other words, they say that the Portsmouth should not have attempted to pass the Crew starboard to starboard, and the Juniata port to port, thus cutting in between the two vessels, but, on the contrary, should from the first have kept to the northern side of the channel, that is to say, between the Dixie, the forward tug and tow, and the Old Point shore, instead of crossing the course of the Crew to the southward, or Ripraps side of the channel, and that that initial fault really caused the collision, superadded to the fact of her not keeping to the southward side of the channel after she started, but porting and crossing the bow of the downgoing steamer, the Juniata. The libelant, on the other hand, insists that the course taken to the southward of the channel, instead of to the Old Point side, was her proper maneuver, as was evidenced by the assent to her signal by the Crew; that it was impracticable for them to pass under

the stern of the Juniata; that they had to port and go across her bow,. and the collision was really caused by the failure of the Crew to properly navigate her vessel, after accepting the passing signal of two whistles, and also because the schooner Palmer made a sudden sheer when in close proximity to the barge, causing her to run into and strike the barge.

The above assignments of negligence and counter negligence of the parties, respectively, in the opinion of the court, account for the collision, and make it necessary to determine which of the respective contentions are correct, and render it unnecessary to give consideration to the other alleged faults assigned by the parties one against the other.

Was there any error in navigation on the part of the Portsmouth, in giving the passing signals to the Crew, and attempting to pass starboard to starboard, instead of port to port? The conclusion of the court is that there was not. The regular course of navigation of vessels coming around Thimble Light, with a view of making the channel of the Elizabeth river, is to the southward of the Hampton Roads channel, below and opposite to Old Point Comfort, as distinguished from the northern, or Old Point, side of the channel. The width of the deep water channel was some 1,500 yards, and there was no reason why the Portsmouth and her tow should not have passed the Crew and the Palmer starboard to starboard, instead of port to port. It was the direct route into Elizabeth river, considerably nearer than around the northern side of the channel, and the Dixie, the other outgoing tow, and her tow of three barges was forward and to the northward of the Crew and Palmer, and, in addition, the route on the Old Point side was probably interrupted, to some extent, by war vessels then lying in the harbor, or the searchlights from such vessels. There was ample room to the southern side of the channel for the two tows to pass in safety, had each observed and respected the usual rules of navigation. The Portsmouth sounded her two whistles, indicating her purpose to pass to starboard, and proceeded to navigate with that end in view. The Crew evidently saw no objection to the course adopted by the Porstmouth, and responded with two signals, thereby acquiescing in the course adopted. Having so accepted those signals, it was the duty of the Crew to have starboarded, and gone to port, with a view of avoiding risk of collision.

The Crew now insists that, in accepting the signals, she was under no necessity to do more than not obstruct or embarrass the Portsmouth in her movements; and, in any event, by reason of the Dixie being to her port, she could not have starboarded and gone further to the north, and that the collision would not have occurred had the Portsmouth not again changed her course by porting, to avoid collision with the Juniata. The court does not concur with the position of the Crew that no obligation was imposed on her further than not to embarrass or obstruct the Portsmouth. On the contrary, she should have starboarded her helm and gone to port, after acquiescing in the Portsmouth's signal to pass starboard to starboard. The sounding of the two reply whistles clearly indicated that there was then no obstruc-

ticn which would have prevented her accepting the Portsmouth's signals to pass starboard to starboard. Had there been such difficulty, the Portsmouth's signals should not have been accepted by the Crew, and, instead, the latter vessel should have indicated to the former the difficulties in the way, by giving danger, instead of passing, signals. This was especially true in the then condition of the channel, and the wind and tide. The Crew should have recognized that the Portsmouth with her tow was meeting two tugs and tows running practically abreast, one of the other, and, further, that an ocean steamship was also ahead of her, and that she must navigate with reference to them all. The master of the Juniata testifies that the Portsmouth navigated properly with respect to his ship, and that it was not practicable for her to continue to starboard and pass further to the southward and under his stern. The court does not think that the testimony in the case sustains the contention of the Crew that there was no reason why she should not, upon accepting the signals of the Portsmouth, have starboarded and gone to port, while the Portsmouth was porting and going to starboard, thereby widening, instead of narrowing, the distance between the incoming and outgoing tow. The evidence, in the view taken by the court, indicates that there was ample room for the Crew, upon accepting the Portsmouth's signals, to have gone a sufficient distance to port, without danger of collision with the Dixie and her tow, the other outgoing tow. The Crew admits that, until dangei was imminent, she had only changed her course half a point after getting the passing signals. This, in the opinion of the court, under the then conditions, was an act of imprudence on her part, sufficient in itself to have brought about the accident, for which there was no excuse. Lake Erie Transp. Co. v. Gilchrist Transp. Co., 142 Fed. 89, 73 C. C. A. 313; The Lowell M. Palmer, 142 Fed. 937, 74 C. C. A. 107; The Luther C. Ward (D. C.) 149 Fed. 787; The Werdenfels, 150 Fed. 400, 404.

The Portsmouth and her tow, as between the two tows, was entitled to the greater latitude in navigation, having the flood tide with them, prevented their controlling their speed and movements with the facility that the Crew and Palmer had to control theirs, navigating against the tide. The Galatea, 92 U. S. 439, 23 L. Ed. 727; The Volunteer, The Syracuse, 49 Fed. 477, 478; Towboat No. 1, Norfolk & Western, 74 Fed. 906, 910, 21 C. C. A. 169.

The only question of doubt in this case, as viewed by the court, is whether the Portsmouth should be held liable to any extent for not giving a greater margin of room for passing the Crew, notwithstanding the latter's failure to discharge her duty in the premises. The conclusion, after much consideration, is that she should not be held so liable; that she was on her regular course coming into Hampton Roads; that there was no reason why she should not take that course; on the contrary, considering the Dixie and her tow then lying to the northward of the Crew and her tow, in the channel, that it was the proper course for her to have taken; and having regard to the passage of the Juniata, as well as the Crew and Palmer, that she did all that could reasonably be required of her. And the fault for the col-

lision is solely attributable to the fact that, after accepting the Portsmouth's signals to pass starboard to starboard, the Crew in effect did nothing to facilitate and make safe the passage of the two tows; and for this fault she is solely liable for the damages arising from this collision.

An examination of the chart of Lower Hampton Roads, down to Thimble Light, will somewhat throw light upon the Crew's conduct. As above stated, the Portsmouth was doubtless influenced in making the maneuver she did by a desire to follow her usual course. It was nearer for her to do so, and the Crew, going out to the Capes, would have been thrown a little off of her course by starboarding and going to port. Her natural course for the Capes, as she was navigating, at and about the scene of the collision, would have been to port, with a view of straightening out for the Capes, rather than starboarding and bearing to the northern side of the channel.

It follows, from what has been said, that neither the Portsmouth, the barge, nor the schooner were guilty of any fault materially contributing to the collision, and that the same resulted solely from fault of those navigating the Crew, and a decree may be entered so ascertaining.